JAMES B. MAYNARD, executor, *vs.* JOHN TYLER & another.

Suffolk.　January 29, 1897. — February 27, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, & KNOWLTON, JJ.

*Will — Instructions — Exceptions.*

The appellant from a decree allowing a will is not entitled to have the jury instructed that, if the testator's widow was his mistress to the time of the marriage, and the marriage was brought about for the purpose of unduly influencing him to make a will in her favor, or in accordance with her desire, they would be justified in finding that the will was obtained by undue influence, especially if the will was not beneficial to her; and an instruction, that "in the eye of the law her position at the time the will was made, in reference to the relation to her husband, was precisely the same as that of the most honored wife in the land," is not open to objection.

If a bill of exceptions alleged at the trial of an appeal from a decree allowing a will states that certain circumstantial evidence therein set forth, with other evidence of a similar kind, was the only evidence relied on to show that the testator's widow used undue influence upon him to induce the making of the will, no ground of exception is shown to the statement by the judge in his charge to the jury that there was no direct evidence upon that point.

No exception lies to the statement by the judge in his charge to the jury, that "the substance of the testimony" of a group of witnesses was of a certain character, if it is fairly stated.

A request for an instruction, at the trial of an appeal from a decree allowing a will, that if the jury should find that, at the time of making the will, the testator was acting under "any hallucination or delusion, or erroneous opinion amounting to delusion," that would be evidence that at that time he was not of sound mind, is properly qualified by the instruction that, "if a person is under an insane delusion in reference to the subject matter, or has an insane delusion concerning a fact which affects his duty and responsibility in preparing a will, if such an insane delusion is proved, that would affect what would otherwise be considered a good will."

APPEAL from a decree of the Probate Court, allowing two certain instruments as the last will and codicil of Benjamin F. Tyler.

The case was tried in this court, before *Knowlton*, J., upon the following issues: 1. Did Benjamin F. Tyler duly execute the instrument offered for probate as and for his last will? 2. Did he duly execute the instrument offered for probate as and for a codicil to his last will? 3. Was he at the time of the execution of the alleged will of sound mind? 4. Was he at the

time of the execution of the alleged codicil of sound mind? 5. Was he unduly influenced in the making and execution of the alleged will by Annie Frances Tyler? 6. Was he unduly influenced in the making and execution of the alleged codicil by Annie Frances Tyler?

The judge allowed a bill of exceptions, in substance as follows.

There was no contest over the first and second issues.

The undisputed evidence showed that Benjamin F. Tyler died in that part of Boston known as Charlestown on February 10, 1895, from saccharine diabetes, at the age of seventy-two years. For many years prior to January 31, 1892, he had been a book-keeper for Hittinger and Company and the Fresh Pond Ice Company. On that day his employment there ended, and afterwards he was engaged in no other business than to take care of his property, which consisted largely of real estate in the occupation of tenants.

He left a widow, whose maiden name was Annie F. Simonds, and three children, Marie L. Tyler, who was unmarried, Emeline B. Simonds, the wife of Calvin Simonds, and John Tyler. John was married, and at the time of his father's death had two sons; and Emeline had three daughters and one son. He left also a brother and sister, Jonas Tyler and Annie Tyler, who were both unmarried. His first wife, who was the mother of his children, died after a long illness on February 1, 1890, and he was marrried to Annie F. Simonds, who was a grandniece of his first wife, and was then only about twenty-nine or thirty years of age, on May 1, 1893. There was evidence tending to show that she had formerly been engaged to be married to his son, who died before the testator; that the engagement had been broken off; and that she was in the testator's family for a while as a nurse during the last illness of his first wife. The appellant, Marie L. Tyler, testified to some things indicating that there were then improper relations between them; and she further testified that, after her mother's death, Annie F. Simonds came to the testator's house, without invitation, on February 22, 1890, and that the witness saw her the next morning coming from the testator's room partly undressed, and told her to leave the house and never to return there. The evidence tended to show that she then went away, and did not return until Jan-

uary 13, 1892; that in the mean time the testator was accustomed to spend part of his evenings at her rooms in East Cambridge; that during most of his life he had been in the daily habit of using intoxicating liquor, and he occasionally, although infrequently, drank to excess; that on January 12, 1892, he was at her rooms, either intoxicated or in a condition resembling intoxication, and almost uncontrollable; that a physician was called, who went with him and Annie F. Simonds to the Quincy House in Boston, whither his son John was summoned, and at a late hour of the night he was carried home by a ruse, and his family physician summoned; that on arriving at the house he was very violent, fighting with his son and daughter with a sword, and attempting to get his pistols; that from that time Annie F. Simonds remained at his house; and that she was sometimes an occupant of his room and his bed.

The appellant, Marie L. Tyler, who had for a long time been regularly employed by a business firm, lived at her father's house, and paid him three dollars per week for her board. For a few weeks during her mother's last illness she left her regular employment and nursed her mother, for which he afterwards made her a present of one hundred dollars. The evidence tended to show that she was greatly disturbed by the presence of Annie F. Simonds in her father's house, and that the other appellant, her brother, strongly objected to it. There was also evidence tending to show that the testator's relations with John and Marie had previously been friendly and affectionate. She testified that in March, 1892, her father notified her to vacate her room; that on her failing to do so, on September 8, 1892, her bed was taken down and put away; that on November 10, 1892, she received notice in writing from her father to leave the house; that on November 19 he told her he never wanted to see her face again, and on November 20 she went away; that she and he remained estranged during the remainder of his life; and that from about that time neither she nor her brother visited their father, or had any communication with him. He and his daughter Emeline maintained their friendly relations, and were accustomed to visit each other as long as he lived. John Tyler admitted, on cross-examination, that he sent his father an anonymous letter in the summer of 1892 in reference to his domestic

relations; and there was evidence tending to show that there was strong feeling on the part of Emeline against her brother and sister in reference to their conduct towards their father.

Marie L. Tyler testified that, on one occasion while she lived at his house, after January, 1892, the testator said he thought his liquor was drugged; that on another occasion, soon after the death of his first wife, some medicine was put into his liquor with a view to administer it without his knowledge, and that he quickly discovered it, and refused to take it. There was also evidence that at another time he said that John and Marie were trying to put him into an insane asylum, and to get his property away from him.

His last marriage was by a justice of the peace, in the presence of only two witnesses, both of whom were former friends of Annie F. Simonds, who had not been acquainted with the testator until after she came to live at his house. He had for many years professed to be an atheist. The marriage was not publicly announced until about May 28, 1893. There was no testimony that Annie F. Simonds ever conversed with him on the subject of making a will, or that she knew of the making of the will or codicil, or of his intention to make either of them until after they were made, except that she was in the room with him and the others a few minutes while the codicil was being executed. The foregoing, and other evidence of a similar kind, was the only evidence relied on as tending to show that she used undue influence upon him to induce the making of either of the instruments.

A great many witnesses were called by the executor, who testified to having been acquainted with the testator for many years, and to having seen him from time to time from January, 1892, until about the time of his death, and who said in substance that they never noticed any change in his mode of speech, his manner, or in his conduct in any particular, that attracted their attention as indicating a change in his mental condition. The evidence tended to show that he was suffering for a long time from a very debilitating and painful disease; and there was testimony that he was less talkative and cheerful during the last part of his life than formerly, and that he showed the effects of weakness and bodily disease in his manner and con-

versation; but there was no testimony of any incoherence in his speech, or of any violence, or of any peculiarities of conduct or manner other than what is above stated. The evidence tended to show that he managed his property and financial affairs, with the aid of persons acting under his direction, until a few days before his death. There was also evidence tending to show that his wife nursed him faithfully during his illness, and did what she could to minister to his comfort and happiness. The uncontradicted evidence in regard to the value of the different parts of his estate tended to show that the amount given to the widow by the will and codicil was less in value than she would have been entitled to receive if he had died intestate.

At the close of the evidence, the appellants asked the judge to instruct the jury as follows: " If the jury shall find, upon the evidence, that the relation of man and mistress existed between the testator and Annie Simonds up to the date of the marriage, and if they shall believe upon the evidence that the marriage was brought about for the purpose of unduly influencing the testator to make a will in favor of Annie Simonds, or in accordance with Annie Simonds's desire, the jury will be justified in rendering a verdict that the will was obtained by undue influence."

The judge declined to give this instruction, and instructed the jury that they had no right to consider, for the purpose of affecting the legal standing of the widow after the death of her husband, any questions as to who or which of the parties was most influential in bringing about the marriage; that they were to consider the question whether the will was procured by undue influence in reference to the relations existing when the will was made; that in the eye of the law her position at the time when the will was made, and at the time when the codicil was made, in reference to her relation to her husband, was precisely the same as that of the most honored wife in the land; that she had a right, when the will was made and when the codicil was made, to a share of his estate; and that if he had seen fit to make a will depriving her of a very large portion of his estate, and giving her little or nothing, the law gives her a right to waive the provisions of the will, and to have one third of all his personal property absolutely, and the use of one third of all his real

estate for her life. To the refusal to give the instruction prayed for, and to what was said in regard to the widow's position in reference to her relation to her husband's estate, the appellants excepted.

The judge also said, in the course of the charge: " I am not aware of any direct evidence in this case that either the will or codicil was procured by undue influence of the wife of the testator. If there is any such evidence as that I have n't it in mind." To the statement in regard to direct evidence, the appellants excepted.

In the course of the charge, after referring to the occasion of January 12 and 13, 1892, the judge used the following language: " I do not remember that any witness has testified to any subsequent occasion when he exhibited conduct of that kind. You will inquire whether any witness has been called as an expert in regard to his mental condition, and has testified to anything indicating that he was afflicted with any form of insanity, at or about the time he made the will or the codicil, or at any time after this occasion in January, 1892, — any witness called as a medical expert upon diseases of the mind to give you an opinion upon any of the evidence which has been introduced, — anything which tends to show that he was afflicted with any kind of insanity. You have had the testimony of a great many witnesses who knew him for a long time, and who saw him more or less frequently nearly to the time of his death, many of them covering a time subsequent to the execution of the codicil. Many of them have testified to his appearance, mode of speech, actions, everything in his conduct that indicated his mental condition, and the substance of the testimony of a great many witnesses is, that, so far as they saw anything in his conduct, his mode of speech, or anything else, there was nothing to attract their attention indicating any change in his mental condition. Many witnesses have testified, as obviously has been proved from other circumstances in the case, that he grew more and more feeble in body up to the time of his death. Well, it is very evident that any feebleness of his body would necessarily affect the strength of his mind, but the substance of the testimony in regard to his mental condition was of the same general character, — that he was the same kind of a man, with the same soundness of mind, that they

had always known and been familiar with. Nobody has testified to the contrary."

The judge further instructed the jury as follows : " Then you have had the introduction of papers before you which he executed, some checks, a letter to his sister written in the year 1892, his memorandum book with more or less of the entries upon it, and other things of that sort, from which you can tell somewhat whether he was a sane man or an insane man at the time of these several occasions, — whether he was in one condition or the other at the time of the execution of the will and codicil. You have had the particulars of those two occasions ; a good many conversations have been introduced on one side and the other by a good many witnesses. You are to judge whether he talked like a man who was of sound mind within the meaning of the law, according to the definition which I have given, when considering that evidence with the other kinds of evidence of which I have already spoken. The case is not necessarily ended, or at least your inquiry is not limited by these considerations. You have the will itself and the codicil, and it is very important for you to look at the will and to look at the codicil, and all of its provisions, which will tend to indicate whether the man understood what he was doing, and was competent to do such a kind of business as he was then engaged in."

The appellants excepted to the statement that the substance of the testimony of a great many witnesses was that, so far as they saw anything in his conduct, etc., there was nothing to attract their attention indicating any change in his mental condition.

After the close of the charge, the appellants asked for the following instruction : " If the jury shall find that at the time of making the will or the codicil the testator was acting under any hallucination or delusion, or erroneous opinion amounting to delusion, as to facts in the conduct of any of the beneficiaries under the will, this will be evidence that at that time he was not of sound and disposing mind."

This request the judge did not give in terms, but instructed the jury as follows : " In regard to the question as to whether this testator was of sound and disposing mind, it is true, of course, that if a person is under an insane delusion in refer-

ence to the subject matter, or has an insane delusion concerning a fact which affects his duty and responsibility in preparing a will, if such an insane delusion is proved, that would affect what would otherwise be considered a good will. The question, so far as that is concerned, is whether there is any insane delusion or hallucination which affects his conduct in the making of the will so that the will is not the will of a man of sound mind."

To the refusal to give the instruction as requested, the appellants excepted.

The jury returned a verdict in favor of the will upon all the issues; and the appellants alleged exceptions.

*J. F. Simmons*, for the appellants.

*C. W. Bartlett*, (*E. R. Anderson & W. H. Preble* with him,) for the appellee.

ALLEN, J. 1. The court rightly refused to give the first instruction which was requested. Bringing about a marriage with a view to the pecuniary benefits that may flow therefrom, either during the life or after the death of the one who has the most property, is no ground of invalidating a marriage, unless fraud or force is used. Nor is every kind of fraud available for this purpose. *Reynolds* v. *Reynolds*, 3 Allen, 605. *Foss* v. *Foss*, 12 Allen, 26. *Crehore* v. *Crehore*, 97 Mass. 330. After marriage, a husband or a wife may lawfully use persuasions to induce the other to make a favorable will, and such persuasions may even be proper. *Parfitt* v. *Lawless*, 2 P. & D. 462, 470. The relations between the parties are then greatly changed; and a husband and wife lawfully married and living happily together are bound to all conjugal duties towards each other, and none the less because illicit relations may have existed between them before marriage. In the present case, there was no evidence whatever that any deception was practised on the testator to induce him to enter into the marriage. The validity of the marriage was unquestioned and unquestionable, so far as the evidence showed. Even if the woman had been the testator's mistress to the time of the marriage, and had brought about the marriage for the purpose of unduly influencing him to make a will in her favor, or in accordance with her desire, as assumed in the request for instructions, there were other important facts to be considered, and the court might well decline to single out those

particular facts and instruct the jury that from those alone they would be justified in rendering a verdict that the will was obtained by undue influence. Indeed, it would seem that the request might well be refused on the ground that there was no evidence to show that the marriage was brought about for the purpose of influencing him to make a will. She may have wished and expected to better her condition by the marriage, but there was no evidence that she contemplated the bettering of her condition after marriage by inducing him to execute a will in her favor, or that she in 'fact so influenced him. The will was not beneficial to her. If it were set aside, she would be the gainer thereby. She had an opportunity to influence him to make a will favorable to herself, or discriminating amongst his children, but that alone is not sufficient to go to the jury on. *Parfitt* v. *Lawless*, 2 P. & D. 462. *Cudney* v. *Cudney*, 68 N. Y. 148. *Main* v. *Ryder*, 84 Penn. St. 217. *Monroe* v. *Barclay*, 17 Ohio St. 302. · The instructions which were given upon the subject of the request had reference to the legal relations which she sustained to her husband, and her legal position as his wife; and there was no error in explaining these in clear and unmistakable terms, especially in view of the fact that there was no testimony that she ever conversed with him on the subject of making a will, or that she knew of the making of the will or codicil, or of his intention to make either of them until the time when the codicil was in fact executed, and in view of the further fact that under the will she would get less property than if no will had been made. The instructions as given are not open to the objection that they were a charge upon the facts, in violation of Pub. Sts. c. 153, § 5.

2. The bill of exceptions states that the circumstantial evidence therein set forth, with other evidence of a similar kind, was the only evidence relied on to show that Mrs. Tyler used undue influence upon the testator to induce the making of the will or codicil. The court might properly state that there was no direct evidence. By express provision of statute, Pub. Sts. c. 153, § 5, the court may state the testimony; and if there is no direct testimony upon a point in issue, the court may so state to the jury.

3. There was no error in the way of stating to the jury what

the testimony was. In stating testimony, it is not necessary, under the statute, to take the witnesses one by one, and give the words of each separately, but they may be grouped and the substance of the testimony of a group of witnesses may be given, provided it is fairly done. In the present case, there was no testimony from anybody of any incoherence in the testator's speech, or of any violence, or of any peculiarities of conduct or manner, except in certain particulars; and a great many witnesses, who said they were acquainted with him, testified in substance that they never noticed any change in his mode of speech, his manner, or in his conduct in any particular that attracted their attention as indicating a change in his mental condition. This testimony and want of testimony appear to have been stated to the jury with entire fairness.

4. The final request for instructions was rightly refused, and the instructions given were proper. In common untechnical speech, one may have delusions which do not imply or show unsoundness of mind. The request for instructions might have been understood to mean delusions of that kind. It was right, therefore, to limit the instructions to insane delusions, such as would go to show unsoundness of mind. *Brown* v. *Ward*, 53 Md. 376, 392. 1 Redf. Wills, 71, note, 86. The further criticism upon the instructions as given is without weight.

*Exceptions overruled.*