[S. F. No. 9230.   Department One.—August 23, 1920.]

In the Matter of the Estate of SOPHIE HESS, etc., Deceased. GERTRUDE HESS VOYER, Appellant, v. GEORGE C. YOUNG, Respondent.

[1] ESTATES OF DECEASED PERSONS — WILL CONTEST — MENTAL INCAPACITY—TESTIMONY OF EXPERTS—OPINION OF COURT—INSTRUCTION AS TO MATTER OF FACT.—An instruction in a contest to the probate of a will on the ground of mental incapacity that the testimony of experts is frequently unsatisfactory and many times unreliable, giving reasons, and that their opinions are not entitled to as much weight as facts, and are often diametrically opposed to each other although based upon the same supposed conditions, involves a violation of section 19, article VI, of the constitution that judges shall not charge juries as to matters of fact.

[2] ID.—OTHER CONSTRUCTIONS—DUTY TO WEIGH EXPERT TESTIMONY —ERROR NOT CURED.—The vice in an instruction discrediting the testimony of experts is not cured by other instructions making it clear that the jury was to weigh such testimony.

[3] ID.—WANT OF TESTAMENTARY CAPACITY—INSUFFICIENCY OF EVIDENCE.—Want of testamentary capacity is not shown by evidence that the deceased entertained a lifelong dislike for the contestant (her half-sister), that after decedent's attack of la grippe she grew more nervous and irritable, that she was subject to hallucinations, such as seeing "black objects," and consulted fortune-tellers for her real or fancied ailments, and that she was subject to insomnia and took sleeping powders.

[4] ID.—ERRONEOUS INSTRUCTION — WHEN NOT PREJUDICIAL.—Where in a will contest it appears from the evidence that if a verdict had been rendered in favor of the contestant it could not have been supported, no prejudice results from the giving of an erroneous instruction.

[5] ID.—EVIDENCE—SOURCE OF ACQUISITION OF PROPERTY.—In a contest to a will on the ground of want of testamentary capacity, it was not error to exclude a copy of the will of the father of the contestant, who was not the father of the deceased, offered for the purpose of showing the source of the property disposed of by the will in question as establishing the equities as between the sisters.

3. What constitutes capacity or incapacity to make a will in general, notes; 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

APPEAL from an order of the Superior Court of Sonoma County admitting a will to probate. Thomas C. Denny, Judge. Affirmed.

The facts are stated in the opinion of the court.

E. J. Dole and R. L. Thompson for Appellant.

F. A. Meyer, Geary & Geary and T. J. Geary for Respondent.

LAWLOR, J.—This is an appeal by the contestant, Gertrude Hess Voyer, from an order admitting to probate the will of Sophie Hess, otherwise known as Sophie Wright, deceased, and appointing as executor the proponent of the will, George C. Young.

Appellant is the half-sister of the decedent, being the issue of the mother's second marriage. The decedent was a spinster, fifty-two years of age at the time of her death on May 25, 1918. She left surviving her no issue, parents, brothers, or sisters, other than appellant. Appellant contests the will on two grounds, (1) that the decedent "was not of sound mind and memory, and, by reason of protracted sickness and imbecility of mind and want of understanding, was mentally incapacitated from making a will," and (2) that the will was not properly executed. The case was tried by a jury and the verdict was that the decedent was of sound mind on June 19, 1917, the date of the execution of the will. By stipulation at the trial "the issues as to the execution of the will" were withdrawn from the jury and submitted to the court for determination.

It appears that decedent and appellant grew up together in the same household with their mother and the father of appellant. Appellant testified that from their early infancy decedent manifested an intense dislike toward her; that when the decedent was about twenty-five or twenty-six years old she had an attack of la grippe and from that time until her death from cancer became increasingly "nervous and peculiar"; that toward the end of her life decedent was addicted to the use of sleeping powders and became very superstitious; and that her dislike for appellant was without any foundation whatever. The witness admitted, however, that she had been jealous because of their mother's love for

the decedent. She further testified that the mother was capable of managing the household until 1905, when she suffered a stroke of paralysis; that the family consisted of herself, decedent, their mother, and the father of appellant; "after his death it consisted of my mother, my sister, and myself"; that a Dr. Serene, who attended the decedent in infancy, had expressed the opinion that she had an "enlargement" at the base of her brain and that unless it was removed it would cause decedent "to lose her mind and die"; that after the mother's stroke of paralysis in 1905 decedent took care of her and would not allow appellant any opportunity to speak with the mother; that decedent had struck the witness on many occasions; that decedent and the mother had frequently complained to her "that the people I kept company with were not good enough for me"; that decedent had told her, "she hated me so much she could hardly look at me"; that she (the witness) and decedent had differed as to the settlement of her mother's estate and the disposition of her property; and that after decedent moved to San Francisco in 1917 the witness made an attempt to become reconciled with her.

Appellant called a number of witnesses in support of the contest. Dr. Kurt Urban testified that he had attended appellant in childhood; that appellant was then "rather nervous, depressed mentally, and subject to insomnia"; that he had expressed the opinion to decedent that appellant should be operated upon; that decedent replied that, "on account of Gertrude's peculiar mental condition, she was in fear of Gertrude's doing some bodily harm to her or their mother"; and that he had told decedent her fears were groundless. Mrs. Emma Harris McMullin testified that on one occasion when she visited decedent in San Francisco, "her eyes had a vacant stare, and I was a little afraid of her." Mrs. Ivy Osborne testified that she had been employed as a night nurse for the mother in 1905; that decedent was "of a nervous temperament, in some ways she was peculiar"; but that she had not noticed any "vacant stare."

Mrs. Ella Mego testified that "Sophie and her mother agreed that they would cut Gertrude off with a dollar if she dared to have any company with any young man." Mrs. Ella Cameron declared that she had first known the decedent in 1893; that "there was quite a lump at the base of

her brain''; and that Dr. Serene had said if this lump were not removed she would ''lose her mind and die.'' Mrs. Louise Huegle testified that she thought decedent had taken sleeping powders, and Mrs. Lena Kalish stated that decedent had told her she could not sleep without taking them. Miss Sarah Frances Cassiday testified that as a young girl the decedent ''was rather peculiar, both in dress and manner.''

Mrs. Catherine Jane Emerson stated that after decedent's attack of la grippe she ''became more nervous, . . . was rather irritable, and complained she could not sleep. . . . I don't think she ever quit taking sleeping powders. . . . Sophie saw black objects and heard rappings about the house. She had signs for everything. . . . She believed in fortune-telling and consulted them for her ailments. . . . A spider came down from the ceiling on his web and hung between us, and . . . Sophie said, 'I am so glad because that lady didn't take the house, for see the spider.' . . . I would say she was irrational because I don't see how anybody could dislike a sister as much as she disliked Gertrude.'' Mrs. Lodia M. Dole testified to decedent's nervousness and sleeplessness after her attack of la grippe and her antipathy toward appellant, and corroborated Mrs. Emerson's testimony. Carl Schuler declared that ''the reputation about the neighborhood was that Sophie was very mean to Gertrude,'' and that on one occasion appellant had come to his house bearing evidences of a blow which she asserted had been struck by the decedent.

Each of these witnesses testified that decedent had always entertained a violent dislike for appellant. Miss Agnes Morrison, who was the nurse attending decedent during her last illness, testified that, while decedent had told her she and appellant were ''not on friendly terms,'' the witness had never administered to her any sleeping powders, and that in her opinion decedent's mind was sound. Appellant's counsel put to Dr. Butler, medical superintendent of the California Home for Feeble-minded Patients, who was not personally acquainted with the decedent, an elaborate hypothetical question, based upon the ''peculiarities'' which previous witnesses had testified the decedent manifested, and his answer was, ''I should say she was irrational, . . . of unsound mind.''

On the other hand, numerous witnesses for respondent, one of whom, Dr. David Domb, was the physician who attended decedent in her last illness, testified that, while decedent was of a nervous temperament and had stated on many occasions that she thought appellant was "after her money," appellant had cordially reciprocated any "attitude of dislike" which the decedent had maintained toward her; and that decedent had uniformly conducted her affairs with a high degree of business acumen.  Dr. Domb testified that in his opinion decedent was of sound mind.

Appellant assigns numerous errors in the giving of instructions as ground for reversal.  The first of these assignments is that "instruction 23, requested by proponent, on the weight and value of expert evidence, was erroneous." That instruction reads: "Medical witnesses have been examined in this contest, and, so far as their testimony is dependent upon hypothetical questions, the court instructs you that: The testimony of experts is frequently unsatisfactory and many times unreliable.  It is unsatisfactory because it cannot convey to our minds the precise reasons why the conclusions are reached; and it is unreliable because it is frequently based upon speculations instead of facts.     Experts in the exact sciences and in mechanics, who base their opinions upon the laws of nature of the exact sciences, and their own experience with those laws, have tangible facts before them; but where the opinions are based upon speculation, where the subject of the inquiry, namely, the operation and condition of the human mind, is beyond the possibility of human knowledge, we should receive those opinions as at least uncertain.  So, when we see a person perform such and such an act, we can form an opinion whether the act is rational or irrational, whether it is consistent with the standard or average human intelligence and reasonableness, but when we advance to speculation upon what would or would not follow upon some supposed existence of mental conditions, we go beyond the scope of knowledge and tread upon the realms of imagination or conjecture. You are instructed, therefore, that, while we receive and you will take into consideration, the opinions of experts, such opinions are not entitled to as much weight as facts, especially where there is a conflict between an opinion and a fact.  When a fact is established, it is a fact and cannot

CLXXXIII—38

be overcome, while an opinion is but an opinion, and it may be true and it may be untrue. Opinions of different experts are often diametrically opposed to each other, even when based upon the same supposed conditions.''

This instruction is in the identical language of one held to be prejudicially erroneous in *Estate of Blake*, 136 Cal. 306, [89 Am. St. Rep. 135, 68 Pac. 827], and on account of which the judgment admitting the will to probate was reversed. The court said: ''The testimony of the experts was competent and went to the very gist of the claim made by contestants. By the instruction the court so discredited it as to practically destroy it. The jury could not but see that the judge had a very poor opinion of testimony of this character. The jury were told that it was unsatisfactory and the reason why it was so. They were further told that it was unreliable and the reason why it was so. Not only this, but, to make assurance doubly sure, they were told that opinions of experts are not entitled to as much weight as facts, and that such opinions based upon the same supposed conditions are often diametrically opposed to each other. While the opinion of the judge may have reasons to support it, it was not proper for him to give his opinion to the jury. Neither was it proper for him to give the jury, in the instruction, an argument as to the reasons why such evidence in his opinion was unreliable and unsatisfactory. The judge may have been of the opinion that the common-law rule, by which the parties in interest were not competent witnesses, is the better rule. Suppose such to have been his opinion, and he had told the jury that the parties had testified, and then told them further that the testimony of parties is unreliable and unsatisfactory because experience has proven that in many cases parties will not tell the truth against their interests. Would anyone doubt that such an instruction would be error? The judge, if allowed to express his opinion as to one class of evidence, would be allowed to do so as to others, and we would have some evidence discredited in every case, depending upon the particular views and prejudices of the judge presiding. . . . The judge, under our system, is not allowed to charge juries as to the facts, but may state the testimony and declare the law. There is no law that declares that the testimony of experts is unsatisfactory and unreliable.'' (See, also, *Quint* v. *Di-*

*mond,* 147 Cal. 707, 714, [82 Pac. 310]; *People* v. *Wilkins,*
158 Cal. 530, [111 Pac. 612]; *People* v. *Hadley,* 175 Cal.
119, 123, [165 Pac. 442].)    **[1]**    It is not to be questioned
that such an instruction involves a violation of section 19,
article VI, of the constitution that judges shall not charge
juries as to matters of fact.

Respondent's first contention is that "this instruction,
taken apart and separate from the remainder, . . . might
be subject to criticism, but, even if it was conceded that
this instruction was not a perfect statement of the law, . . .
yet it is submitted that, considering the failure of contestant
to establish her case, error . . . would not, under the circum-
stances of this case, justify a reversal." In this connection
we shall first consider respondent's claim that, in the light
of other instructions, there was no error. The other instruc-
tions referred to are numbers 29, 40, and 41, given at the
request of appellant. It is claimed that "they gave the
jury a fair statement of the law applicable to expert
testimony." But they do not cover the point in-
volved. Number 29 is to the effect that the opinions of
experts, though proper to be considered "and entitled to
have at your hands all the weight which reasonably and
justly belongs to them, are, nevertheless, not binding on
you against your judgment." Number 40, after dealing
with the qualifications of experts, continues that in arriving
at a conclusion the jurors "may take into considera-
tion their testimony and award to it such value as in your
judgment it deserves." Number 41 correctly defines a hypo-
thetical question and charges that "the opinion of the wit-
ness must, therefore, be brought to the test of the facts in
order that you may judge what weight the opinion is en-
titled to." It is not contended that these instructions do
not correctly state the law touching expert testimony as far
as they assume to deal with it.    **[2]**    But, while the instruc-
tions make it clear that the jury is to weigh such testimony,
in no manner did they tend to cure the vice in the one com-
plained of.

We shall next consider respondent's contention that "the
testimony on the part of contestant . . . did not show . . .
mental incapacity on the part of the testatrix at the time of
the execution of the will. . . . For this reason if any error
had been committed by the court in its instructions . . .

it would be harmless and unprejudicial error, on which a judgment cannot be reversed." It was said in *Estate of Carpenter*, 94 Cal. 406, 419, [29 Pac. 1101, 1105]: "People may hate their relatives for bad reasons, and yet not be deprived of testamentary power." And in *Estate of Spencer*, 96 Cal. 448, [31 Pac. 453], the court declared: "The likes and dislikes of human beings—their confidences and mistrusts—are often capricious and arbitrary; but they are not evidences of insanity because they cannot be logically defended to the satisfaction of those who think them wrong. . . . 'The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust.' (*Jackson* v. *Jackson*, 39 N. Y. 157.)'' (See, also, *Estate of Kendrick*, 130 Cal. 360, [62 Pac. 605]; *Estate of Riordan*, 13 Cal. App. 313, [109 Pac. 629]; *Estate of Kaufman*, 117 Cal. 288, 295, [59 Am. St. Rep. 179, 49 Pac. 192].) We quote from *Estate of Redfield*, 116 Cal. 637, 652, [48 Pac. 794, 798]: "Before a will can be rejected on that account [that the testator was subject to insane delusions] it must appear that 'its dispository provisions were or might have been caused or affected by the delusion' (*American etc. Soc.* v. *Hopper*, 33 N. Y. 625); delusions which are not operative in the testamentary act . . . are not permitted to invalidate it." And the court held in *Estate of Chevallier*, 159 Cal. 161, 168, [113 Pac. 130, 133], that insanity which will invalidate a will "must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion. And, even in the latter class of cases, it would not be sufficient merely to establish that a testator was the victim of some hallucination or delusion to avoid the will. The evidence must go further and establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument." (See, also, *Estate of Kendrick, supra; Estate of Guilbert*

(Cal. App.), 188 Pac. 807; *Maynard* v. *Tyler,* 168 Mass. 107, [46 N. E. 413].)

[3]  Viewing the evidence in the light most favorable to appellant, it appears that decedent entertained a lifelong dislike for her; that after decedent's attack of la grippe she grew more nervous and irritable; that she was subject to hallucinations, such as seeing "black objects," and consulted fortune-tellers for her real or fancied ailments; and that she was subject to insomnia and took sleeping powders. In view of the foregoing authorities we cannot agree with appellant that the evidence shows a want of testamentary capacity on the part of decedent. Decedent's dislike for appellant would not constitute unsoundness of mind. It may have been caused by the jealousy which appellant admitted she harbored toward decedent because the mother, as she thought, favored her, or have had its origin in the belief that, as the mother complained, appellant's associates were unsuitable for her. It appears from Dr. Urban's testimony that, to some extent at least, decedent's fears of appellant were based upon the latter's depressed mental condition. And decedent's dislike for appellant may have been heightened by the difference between them over their mother's estate. Mrs. McMullin's testimony that she had noticed a "vacant stare" in decedent's eyes is not indicative of any delusion, or, if it is, that such delusion constituted unsoundness of mind which influenced the making of the will. This must also be said of the testimony of Mrs. Kalish and Mrs. Huegle. Mrs. Cameron's testimony as to Dr. Serene's opinion of the effect of the "lump" at the base of decedent's brain does not show a lack of testamentary capacity at the time of the making of the will, for it does not appear that decedent suffered from this trouble in her later years. Moreover, it was hearsay and incompetent. Mrs. Mego's testimony only tends to confirm the existence of decedent's profound antipathy toward appellant. The peculiar notions of dress and the mannerisms referred to by Miss Cassiday at most amounted to idiosyncrasies which would not constitute delusions. The hallucinations and superstitions to which Mrs. Emerson and Mrs. Dole testified are not uncommonly entertained by persons whose soundness of mind is not questioned, and certainly there was not a shred of evidence to show that any of these peculiarities, hallucina-

tions or beliefs affected the provisions of the will. Moreover, it is not questioned that decedent conducted her affairs with intelligence and shrewdness. Indeed, no claim is made that there was not sufficient evidence before the jury to warrant the finding of testamentary capacity.

We quote from *Estate of Collins,* 174 Cal. 663, [164 Pac. 110], as to the hypothetical testimony of Dr. Butler: "At best, the testimony of expert witnesses as to insanity, based on hypothetical questions skillfully framed to call for an answer favorable to the party in whose behalf it is asked, 'is evidence the weakest and most unsatisfactory.' (*Estate of Dolbeer,* 149 Cal. 227, 243, [9 Ann. Cas. 795, 86 Pac. 695].)'" (See, also, *Estate of Flint,* 179 Cal. 552, [177 Pac. 451].) Dr. Butler stated in support of his opinion: "The facts . . . which I consider essential to justify my conclusions are those delusions. By delusions I mean the delusions there of this figure, for instance of the other delusions, seeing spiders, also the idea of her sister going to kill herself and her mother. Persecutions. By delusions I mean something that is not natural, have an opinion about something that is not real, saying or thinking something that is not real." But it was for the jury to decide whether it had been established by appellant's witnesses that decedent was subject to any delusions. Moreover, the hypothetical question put to Dr. Butler did not fix any particular time when it was claimed decedent had delusions. [4] From this analysis of the evidence it is plain that if a verdict had been rendered in favor of appellant it could not have been supported. If this be true, then no prejudice resulted from the giving of the erroneous instruction.

But appellant contends that certain rulings on evidence "were of such a character as to seriously prejudice the presentation of contestant's case." Mrs. Lena Krone, who had known both decedent and appellant "as a little girl," was asked by counsel for appellant: "From your observation and knowledge of Sophie and Gertrude Hess, did you consider that Sophie's hatred of her sister was rational or irrational?" Counsel for respondent interposed the objection that the question was "immaterial, irrelevant, and incompetent," and the objection was sustained. It appears, however, that the witness was later asked the same question, no objection was made, and the question was answered. This

answer was not stricken out. It cannot be said that appellant was prejudiced by the ruling.

Appellant also assigns error to the ruling which appears in the following excerpt from the testimony of Mrs. Dole: "Q. Basing your judgment on what you have told us and all that you know in regard to Sophie, would you say that her mind, particularly with regard to her sister Gertrude, was rational or irrational? A. She was absolutely irrational. Mr. Geary [counsel for respondent]. To that question we object as immaterial, irrelevant, and incompetent. . . . The Court. Yes, that is for the jury to determine." Appellant cannot complain of any error in this ruling because the question was answered and no motion was made to strike out the answer.

It is further contended by appellant that the court erred in sustaining respondent's objection to a question which was put to Dr. Urban after he had testified that decedent expressed to him a fear that appellant would do her "some bodily harm": "Now, was there any danger that Gertrude would do anything in the nature that Sophie feared? Did you see any ground for that fear?" This witness had already testified that he told decedent there were no grounds for her fear. Assuming that the inquiry was proper, upon the entire record we do not perceive how the ruling could have been prejudicial.

[5] Appellant's next assignment of error is to the ruling of the court in excluding a copy of the will of appellant's father, Frederick Hess. Her contention is that this was admissible as tending to show "the source of the property" disposed of by the will herein, "as establishing the equities between the sisters." In other words, appellant's position is that, inasmuch as Frederick Hess was not the father of decedent, his will, by which it is claimed, "he treated the two girls alike," gave appellant a claim "on her sister's bounty." With this we do not agree. Any possible effect of this evidence was so nebulous that it could have no bearing on the issues. *Estate of Ruffino,* 116 Cal. 304, [48 Pac. 127], cited by appellant on this point, was a case where it was held that, "upon the question of undue influence," evidence was admissible of the source from which the decedent acquired the property disposed of in the will. In this case the question is one of testamentary capacity.

Even if all the rejected evidence had been admitted, there would still be a failure by appellant to show that decedent was mentally unsound at the date of the execution of the will. In this view it will not be necessary to consider appellant's assignments of error in the giving of various other instructions or respondent's contention that *Estate of Blake,* having been decided prior to the adoption of section 4½, article VI, of the constitution, is not authority for the reversal of the judgment herein because of the giving of instruction 23.

The judgment is affirmed.

Shaw, J., and Olney, J., concurred.

Hearing in Bank denied.

All the Justices concurred.