ALFRED ARCIERI *vs.* M. JACQUELINE BURKE.

Suffolk.    November 6, 1945. — January 4, 1946.

Present: FIELD, C.J., LUMMUS, DOLAN, RONAN, & SPALDING, JJ.

*Undue Influence.*

At the trial of an issue, whether the execution of a will was procured by the fraud or undue influence of the decedent's second husband, the principal beneficiary and executor named therein, it was error to deny a motion by the proponent that the issue be answered in the negative where there was no evidence of any influence exercised by him upon the decedent respecting the will.

PETITION, filed in the Probate Court for the county of Suffolk, for proof of the will of Mary M. Arcieri, late of Boston.

The issue described in the opinion was framed in the Probate Court and was tried in the Superior Court before *Hurley,* J.

*R. J. Curran,* for the petitioner.

*F. W. Ziniti,* for the respondent.

LUMMUS, J.  This is a petition by the executor named in an instrument purporting to be the will (hereinafter called the will) of Mary M. Arcieri, formerly Mary M. Burke, for the probate of that will.   The contestant is Mary Jacqueline Burke, the adopted daughter of the decedent and her first husband, Patrick J. Burke, who died on January 8, 1940.   The case was tried to a jury in the Superior Court upon the issue, "Was the execution of said alleged will of said Mary M. Arcieri procured by the fraud or undue influence of her husband, Alfred Arcieri, exercised upon the said Mary M. Arcieri?"   The jury answered "Yes."

The case is here upon exceptions taken by the proponent. One of them was to the denial of his motion that the jury be directed to answer the issue in the negative.  The burden was upon the contestant to show that the will was the product of fraud or undue influence as set forth in the issue.

*Bacon* v. *Bacon*, 181 Mass. 18, 21.  *Neill* v. *Brackett*, 234 Mass. 367.  *Mirick* v. *Phelps*, 297 Mass. 250, 252.  *O'Brien* v. *Collins*, 315 Mass. 429, 437.

The will, executed on November 10, 1943, a few days after the decedent married the proponent and about eight months before she died on July 24, 1944, gave a legacy to the contestant of $10 "knowing that I have helped her financially on many occasions during the past," and legacies of $500 each to a brother and a niece of the decedent.  The residue was given to the proponent, the second husband of the decedent, and he was named as executor.  There was evidence that during her first marriage the decedent and her first husband had made wills for the benefit of the contestant.

The contestant was adopted in 1913 as a small child. Even after she left home in 1935 to become a registered nurse, her parents kept her supplied with money until the death of her father in 1940.  After his death the decedent kept her supplied with money until the contestant returned to work in July, 1940, after an illness.  Then the contestant took legal steps against the decedent with respect to the estate of Patrick J. Burke, and in the latter part of 1940 collected $261 from the decedent through a lawyer.  But the contestant testified that cordial relations with the decedent were resumed at that time, and continued until the latter's death.  However, on February 14, 1942, the contestant wrote the decedent a letter, asking the decedent to help her "this last time" to the extent of $400.  Whether that sum was paid or not does not appear.  In 1943 the contestant was earning from $28 to $49 a week.

On October 31, 1943, the decedent, then sixty-six years old and living alone at the Hotel Minerva in Boston, married the proponent, a musician thirty-seven years old then living at the same hotel.  They had known each other about a year.  The contestant first heard of the marriage a few weeks afterwards.

The will was drawn by a lawyer who had represented the decedent ever since 1940.  She came to his office alone about the will.  He did not meet the proponent during the

life of the decedent. There is no evidence that the proponent was with his wife on the day the will was executed, November 10, 1943, and there is evidence that he was not and that he did not know of the will until April, 1944. Two earlier wills had been drawn by the lawyer and executed by the decedent, the first of them in December, 1940, and in neither of them was the contestant given more than a nominal legacy.

There was no evidence of any actual influence, much less any undue influence, exercised upon the decedent by the proponent. There was no evidence that he failed to treat the decedent with marital kindness, or to make her happy. On the contrary, there was evidence that after her second marriage the decedent appeared more youthful than before, that she said that she was lonesome for the proponent while he was in the army, and that on May 25, 1944, when a friend remarked that the decedent looked thin she replied, "Maybe it will kill me, but I don't want to lose him."

The only evidence in any way reflecting adversely upon the proponent as a husband is testimony that following the funeral of the decedent at a dinner given by him to persons who had attended the funeral, the proponent made remarks that would warrant the inference that her death brought him less grief than relief. But that he ever failed in his duty to her does not appear. Neither does this testimony indicate any exercise of undue influence many months before.

In our opinion there was error in the failure to grant the proponent's motion for a directed answer in his favor. His exceptions are sustained.

An answer in the negative is to be entered upon the issue hereinbefore stated. G. L. (Ter. Ed.) c. 231, § 124; c. 215, § 16.

*So ordered.*