Baxter *v.* Grasso.

JAMES W. BAXTER *vs.* BARBARA J. GRASSO & another.[1]

No. 98-P-2348.

Essex. October 13, 2000. - January 8, 2001.

Present: PERRETTA, GILLERMAN, & PORADA, JJ.

*Will,* Undue influence.

Discussion of the analytic framework for assessing the strength of an affidavit, filed pursuant to Probate Court Rule 16, objecting to a petition for the probate of a will. [694]

Statements in an affidavit objecting to a petition for the probate of a will on the grounds of undue influence, together with all fair inferences therefrom, provided specific facts and grounds on which the objection was based, as required by Probate Court Rule 16, and a motion to strike the appearance and objections of the affiant should not have been granted. [696-698]

PETITION for probate of a will filed in the Essex Division of the Probate and Family Court Department on April 28, 1998.

The case was heard by *John C. Stevens, III,* J.

*Stephen J. Corcoran* for the plaintiff.

*Freya Allen Shoffner* for the defendants.

GILLERMAN, J. James G. Baxter, Jr. (testator), died March 19, 1998. His last will, dated October 9, 1997, was presented for probate by petition dated April 23, 1998. Emma Sheridan, an aunt of the testator, was named executrix; she declined to accept the appointment. The petitioners for the will are cousins of the testator and nieces of Emma Sheridan. They were named residuary legatees and successor co-executrices under the testator's will (nieces). The testator's son, James, filed a written appearance objecting to the allowance of the petition together with his affidavit in support of the objections. See rule

---

[1]Joan L. Lannon. Grasso and Lannon are petitioners for the probate of the last will of James G. Baxter, Jr.

16 of the Probate Court (1987),[2] which we set out in the margin.[3] In response, the nieces moved to strike the objections and appearance of James, and filed affidavits and other documents in support of their motion. See note 3, *supra.*

A judge of the Essex Probate and Family Court allowed the nieces' motion to strike the objections and appearance of James. In his written order dated September 28, 1998 (the record is silent as to whether there was a hearing), the judge wrote that his ruling was "based upon the absence of specific facts alleged by affidavit which, if true, would establish that the decedent's will was overpowered by the alleged undue influence of another causing him to dispose of his estate as he did." The judge's decision appears to have been based entirely on James's affidavit, and his ruling was one of law.

---

[2] Rule 16 of the Probate Court, applicable to will contests, was amended, effective January 2, 1987, to take account of St. 1986, c. 211, § 1, which had abolished jury issues in Probate Court proceedings. See *Wimberly* v. *Jones,* 26 Mass. App. Ct. 944, 945 n.4 (1988).

Rule 16(a) provides for objections to a petition for probate supported by "a written affidavit . . . stating the specific facts and grounds upon which the objection is based . . . ." The objections, if insufficient, may be stricken upon motion of the party presenting the petition for probate.

[3] Rule 16 provides, in full, as follows:

"RULE 16. WILL CONTESTS

"(a) If any person who has filed an appearance pursuant to General Probate Rule 2 on a petition for the probate of a will fails to file a written affidavit of objections to the petition, stating the specific facts and grounds upon which the objection is based, within thirty (30) days after the return day (or such other time as the court, on motion with notice to the petitioner, may allow), the court may, upon its own motion or on motion of the petitioner, the guardian ad litem (if any), or any person whose appearance is on file (with notice to any person whose appearance is on file and, if applicable, the guardian and petitioner), order the appearance struck.

"(b) If an affidavit of objections fails to comply with the requirements of the foregoing section (a), such affidavit of objections and the appearance of the party filing such affidavit of objections may be struck on motion with notice in the manner provided in the foregoing section (a) at any time after the filing of such affidavit of objections.

"(c) Upon the filing of an affidavit of objections, the court or any party may request a pretrial conference to be held within thirty (30) days. The court at such pretrial conference may consider any of the matters enumerated in Rule 16 of the M.R.Civ.P. and may enter a pretrial order with respect to any one or more of such matters.

"(d) No postponement or continuance of the trial date set by the court at such pretrial conference shall be granted except for good cause shown upon motion with notice allowed by the court after hearing."

We discuss, first, the analytic framework for assessing the strength of James's affidavit. In *Wimberly* v. *Jones*, 26 Mass. App. Ct. 944, 946 (1988), we said, "The present rule 16 merely requires contestants with standing to state in *verified* form the 'specific facts and grounds upon which . . . [the] objection is based,' a requirement which is no more burdensome than court rules in other areas of the law requiring a plaintiff to assert with specificity in his complaint (or other pleading) allegations which, if proved, would entitle him to prevail" (emphasis in original).

*Wimberly* finds support in the analogy to Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974) (undue influence, etc., "shall be stated with particularity"), but we think that it is sufficient to say that the source of the specificity required by rule 16 is the rule itself. Rule 16(a) provides that the required affidavit shall state "the specific facts and grounds upon which the objection is based . . . ." Rule 16(b) provides that the adequacy of the required specificity may be presented for adjudication by filing a motion to strike the affidavit and appearance of the objectors. Thereafter, under rule 16(c), any party may request a pretrial conference at which a trial date may be fixed.

It has been said, and correctly we think, that "the purposes of revised Rule 16 are two-fold: to screen out frivolous will contests and to provide an expeditious resolution of those will contests which are advanced with serious intent." Kehoe, Will Contests Under Probate Rule 16, 83 Mass. L. Rev. 6, 7 (1998). Whether the affidavit of an objector is to be deemed frivolous does not turn on a challenge — in the form of opposing affidavits — to the credibility of the objector. It hangs on the content of the affidavit itself.

We agree, then, with the judge's approach to the resolution of the motion to strike: we look only to James's affidavit and accept as true all the allegations of the affidavit.[4] We are in the same position as the judge was in assessing its strength. See *Loche* v. *Dean Whitter Reynolds, Inc.*, 26 Mass. App. Ct. 296, 303 (1988); *Cohen* v. *Lynn*, 33 Mass. App. Ct. 271, 274 n.6 (1992).

We turn to those assertions in James's affidavit which purport

---

[4]The nieces filed affidavits and copies of other documents in support of their motion to strike the appearance of James. Under Rule 16, we do not consider the documentary submissions of the proponent of the motion to strike the appearance of the objector.

to bear directly on the issue of undue influence. (The emphases appearing in the following ten numbered paragraphs have been added throughout.)

1. James was born to a single mother in 1968. The testator married James's mother in 1972; they had known each other since childhood. In 1974, the testator adopted James. James was then six years old. Emma Sheridan "never liked my mother . . . . She called my mother a 'tramp.' "

2. The testator's mother and her sisters (aunts), including Emma Sheridan, never approved of the marriage, harassed James's mother, and made it clear that James was not "welcome as a family member." The testator's aunts never had children and were protective of the testator.

3. The testator was "*close to illiterate*," was easily provoked to anger, and "*became completely dependent upon his aunts for everything* from his banking to making appointments for him for various things."

4. James's mother left the testator in 1985, and James was given the choice to stay with the testator or go with his mother. He chose the testator. "I felt that my father would be lonely and I felt sorry for him *so I stayed in Andover to help him.*" With the departure of James's mother, the aunts, including Emma Sheridan, "became more a part of his life than ever." "It was *mandatory that my father see his aunts every weekend . . . ." The aunts put all of the testator's bank accounts "in both of their names.*"

5. The aunts never treated James or his mother like "family" or with any respect whatsoever. Emma Sheridan constantly came between James and his father. Emma "had much hate" for James's mother; she called his mother a "tramp" who took the testator "for a ride." James told Emma to stop saying such things. James felt that Emma held her problems with his mother against James.

6. James paid rent to his father, which was increased after James's girlfriend moved in. He also contributed to the telephone bill and the cable bill.

7. "Emma would always tell me that if I did not take care of my father that *'they' would remove me from the Will.*" In August, 1997, the testator told James that he had to increase his contributions to the expenses of the house, and admitted to James that "*it was Emma's idea.*" When James protested about the amount

asked of him, the testator said, "'*I'm sorry, there [sic] making me do it.*' " Shortly thereafter, Emma told James that he should be paying all the bills for the house, and if he did not, " '*we*' *will have you removed from the Will.*"

8. The residuary legatees under the testator's will were Barbara Grasso and Joan Lannon; they were the testator's cousins and Emma's nieces. Emma was quite close to her nieces. The nieces "*had not come to our house in at least fifteen to twenty years. They never called my father.* They were strangers to me."

9. Some days after the funeral, Emma told James "that 'they' had written a will in 1987, leaving me out, *fearing that my mother might somehow get that house through me.* She then said that he changed it in the mid 90's in my favor *and then changed it again recently.* She told me that she, my father and the lawyer had sat down to discuss the rent that I was paying around September 1997."

10. "The day on which my father executed his Will [October 9, 1997,] was a *Thursday, a day each week* he was with Emma Sheridan."

It is settled law that, to constitute undue influence, four factors must be satisfied: "(1) [an] unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) . . . [who had] an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through [the] improper means [of undue influence]." *Heinrich* v. *Silvernail,* 23 Mass. 218, 223 (1986).[5] We look to determine whether the statements in James's affidavit, all of which we must assume to be true, together with all fair inferences therefrom which are favorable to James, are sufficient to satisfy the standard of Rule 16: "specific facts and grounds" upon which James's objections are based.

As to the first factor set forth in *Heinrich* v. *Silvernail,* above: The testator's will provided for a pecuniary legacy of $5,000 to his son James who lived with him, cared for him, and stuck by him when James's mother decided to leave the house. The testator's entire residuary estate was devised to Emma's two nieces (the testator's cousins) who had not been seen at the

[5]A detailed discussion of undue influence appears in *Neill* v. *Brackett,* 234 Mass. 367, 369-370 (1920).

testator's house in fifteen to twenty years, and who never called the testator. We may infer that the two nieces rarely saw the testator (if they did at all in the past fifteen years) and that the residuary estate consisted at least of the house formerly occupied by the testator and James, and that the value of the house substantially exceeded the $5000 bequest to James.[6]

In the circumstances just described, the gift of the entire residuary estate to Emma's two nieces, while devising merely $5000 to James, constitute specific facts supporting the inference that an unnatural disposition had been made in the testator's will.

As to the second factor: There are specific facts alleged to the effect that the testator was almost illiterate and was highly dependent on the aunts. See the paragraph numbered 3, *supra* (describing the general dependency of the testator upon his aunts), and paragraph 7 (describing the circumstances under which the testator acknowledged — and Emma confirmed — the power and influence of the aunts over the testator). The susceptibility to the undue influence of the aunts — Emma Sheridan in particular — may be inferred, and it worked to the advantage of Emma's nieces, the residuary legatees.

As to the third factor: The aunts had numerous opportunities to exercise undue influence. See the paragraph numbered 4, *supra* (describing the visits of the testator to his aunts every weekend), and paragraph 10 (describing Emma's being with the testator on the day he executed his last will).

As to the fourth factor: The fair inference from the allegations described above is that Emma effectively used the numerous opportunities available to her to exercise undue influence over the testator to the end that the testator's testamentary disposition provided that the bulk of the estate would pass to Emma's nieces and only a modest pecuniary bequest to his only son.

We recognize that James's affidavit is not a model of clarity or completeness. There is much to be explored before all the details emerge clearly. But the exploration of the details is not the stuff of a motion to strike an appearance and objections. We are persuaded that James's affidavit satisfies the specificity requirement of Probate Court Rule 16(a). Moreover, assuming,

---

[6]There having been no opportunity for discovery, there is nothing in the record regarding the value of the gross estate.

for the purpose of this appeal only, that the facts set forth in the affidavit, and all fair inferences therefrom, will be proved, then it does not now appear certain that James will be unable to show that he is entitled to the relief he seeks. More than that is not required. The allowance of the nieces' motion to strike James's appearance and his objections must be reversed.

The judgment is reversed, and the case is remanded to the Probate Court for further proceedings.[7]

*So ordered.*

---

[7]We bring to the attention of the parties that, beginning January 1, 2000, the rules of the Probate Court provided for discovery and summary judgment. See Rule 27A ("Depositions and discovery shall be governed by Rules 26 through 37 of the Mass.R.Civ.P.") and Rule 27B ("Summary judgment may be granted in accordance with the provisions of Rule 56 of the Mass.R.Civ.P."), adopted October 27, 1999, effective January 1, 2000.