JESSIE W. NEILL & others, executors, *vs.* GLADYS B. BRACKETT & another.

Suffolk.    October 24, 1919. — January 7, 1920.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Will*, Validity.  *Fraud.  Undue Influence.  Evidence*, Presumptions and burden of proof.

Statement by RUGG, C. J., of the principles of law determining what constitutes fraud or undue influence which will render invalid an instrument duly executed by a person of testamentary capacity as and for his last will.

At the trial of an issue, whether a will was procured to be made through the fraud or undue influence of the decedent's widow, his second wife, the trial judge, subject to an exception by the executor, refused to order that the issue be answered in the negative.  There was evidence warranting a finding that, after his second marriage, the decedent's powers both of mind and body began to wane, one physician testifying that he was "a little bit dull and a bit childish about some little things and his mind puerile; . . . in such condition that he could be easily influenced;" but, upon all the evidence, it was *held* that the exception must be sustained because the evidence fell short of showing an imperious and overruling spirit on the part of the widow which swayed the decedent's mind into conformity with her desires against his own judgment.

APPEAL from a decree of the Probate Court for the county of Norfolk allowing the will of Edward E. Richards, late of Brookline. The appellants were Gladys B. Brackett and Bertha E. Porter, children of the deceased by a first marriage.

In the Supreme Judicial Court for the county of Norfolk, the following issues were framed and sent to the Superior Court for trial by a jury.

"(1) Was the instrument purporting to be the last will and testament of Edward E. Richards duly and legally executed?

"(2) Was Edward E. Richards of sound and disposing mind and memory at the time of the execution of the instrument propounded for probate as his last will and testament?

"(3) Was said alleged will procured to be made through the fraud or undue influence of Mary E. Fallon and Sally S. D. Richards, or either of them?"

In the Superior Court, the issues were tried before *White*, J. Sally S. D. Richards, named in the third issue, was the decedent's widow, a second wife. Mary E. Fallon was his stenographer and bookkeeper. The alleged will was dated January 30, 1915, and contained provisions giving to the decedent's widow, Sally S. D. Richards, $3,000 and "all the fixtures, furnishings, pictures, books, furniture in the house in Brookline, and in the house at Marblehead automobile and contents of both stables at Marblehead and at Brookline;" to each of his daughters by his first marriage, the appellants, $500; to each of his two sisters, $500; to his grandchildren, children of the appellant Mrs. Porter, $300 each; to Mary E. Fallon, $300 and eight shares of stock in the Richards Real Estate Company; to Clarence W. Starratt, an employee, $300; to Jessie W. Neill, an employee for many years in charge of an office of the decedent, $500; to William Frank, an employee, $100; to each domestic servant who was in his employ at the time of his death, for a period of not less than five years, $25.

Provisions of the trust established by the residuary clause are described in the opinion. Jessie W. Neill, Mary E. Fallon and the decedent's widow were named as executrices and trustees without sureties on their official bonds.

Other material evidence is described in the opinion.

At the close of the evidence, the proponents of the will moved that the first and second issues be answered in the affirmative and that the third be answered in the negative. The motion was denied. The proponents then asked for rulings, among which was a ruling that, upon all the evidence, the jury must answer the third issue in the negative. The ruling was refused.

The jury answered all the issues in the affirmative; and the proponents of the will alleged exceptions.

*F. H. Stewart*, for the appellees.

*J. H. Devine*, (*A. P. Gay* with him,) ror the appellants.

Rugg, C. J. This case comes before us on exceptions taken at the trial in the Superior Court of issues framed respecting the allowance of an instrument offered for probate as the last will of Edward E. Richards. The finding of the jury was in favor of the proponents as to the due execution of the instrument as a will and the soundness of mind of the deceased.

The remaining issue, with which alone we are now concerned,

was whether the alleged will was "procured to be made through the fraud or undue influence of Mary E. Fallon and Sally S. D. Richards or either of them." The question is whether there was any evidence which warranted the submission of this issue to the jury, or whether a negative answer should have been directed.

Fraud and undue influence in this connection mean whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammelled desire. It may be caused by physical force, by duress, by threats, or by importunity. It may arise from persistent and unrelaxing efforts in the establishment or maintenance of conditions intolerable to the particular individual. It may result from more subtle conduct designed to create an irresistible ascendancy by imperceptible means. It may be exerted either by deceptive devices, or by material compulsion without actual fraud. Any species of coercion, whether physical, mental or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence. Its extent or degree is inconsequential so long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the person signing the instrument. Any influence to be unlawful must overcome the free will and eliminate unconstrained action. The nature of fraud and undue influence is such that they often work in veiled and secret ways. The power of a strong will over an irresolute character or one weakened by disease, over-indulgence or age may be manifest although not shown by gross or palpable instrumentalities. Undue influence may be inferred from the nature of the testamentary provisions accompanied by questionable conditions, as for example when disproportionate gifts or benefactions to strangers are made under unusual circumstances. When the donor is enfeebled by age or disease, although not reaching to unsoundness of mind, and the relation between the parties is fiduciary or intimate, the transaction ordinarily is subject to careful scrutiny. In such an inquiry all the attributes, sensuous, intellectual, ethical and religious, of the individuals concerned are involved. Strength or infirmity of will, natural and cultivated tastes and temperament, and tendencies to passion, resentment, obstinacy, prejudice and calm, all are elements to be considered. A strong sense of justice, determination and stead-

fastness of purpose are significant considerations, as are also a spirit of domination, persistent desire to rule, and deep-seated selfishness. Age, weakness and disease are always important factors. Relations of intimacy, confidence and affection in combination with other circumstances are entitled to weight.

There may be influences directing the will-maker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but, so long as not coercive, they are not undue. Circumstances often arise where such conduct is wholly justifiable. (The mere opportunity of the wife, when living happily with the husband, to influence the execution of a will favorable to herself, or to cause discrimination against or amongst children, is not alone sufficient to warrant submission to the jury of the question of undue influence.) Mere suspicion, surmise or conjecture are not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence. This proposition applies with peculiar force when the result of drawing such an inference is to destroy the effect of a written instrument prepared with deliberation and signed and attested with all the formalities required by law for the execution of a will.

Fraud or undue influence, such as, if found to have been exercised, invalidates a will, may be manifested in divers ways. It is not practicable nor desirable to attempt to lay down any hard and fast rule. Whatever may be the particular form, however, in all cases of this character three factors are implied: (1) a person who can be influenced, (2) the fact of deception practised or improper influence exerted, (3) submission to the overmastering effect of such unlawful conduct. *Shailer* v. *Bumstead*, 99 Mass. 112. *McKeone* v. *Barnes*, 108 Mass. 344. *Woodbury* v. *Woodbury*, 141 Mass. 329. *Maynard* v. *Tyler*, 168 Mass. 107. *Dresser* v. *Dresser*, 181 Mass. 93. *Hoffman* v. *Hoffman*, 192 Mass. 416. *Whitcomb* v. *Whitcomb*, 205 Mass. 310. *Aldrich* v. *Aldrich*, 215 Mass. 164. *Emery* v. *Emery*, 222 Mass. 439.

The deceased in the case at bar was about sixty-five years of age at the time of the execution of the instrument in 1915. His first wife had died in 1909, leaving two daughters. Both of these were married and each had become mothers before 1915. Each testified

that the deceased was a loving, thoughtful, generous father to the end, and there was no evidence to the contrary.

Sally S. D. Richards was the second wife of the deceased, married at the age of twenty-one to him when sixty-one years old, a year and four months after the death of his first wife. She was about the age of the deceased's younger daughter, with whom she was intimate and to whom she was a second cousin. She had known the deceased all her life and was engaged to him for about three months before their marriage. A daughter was born to them about two years after the marriage, who survived the decedent. For considerable periods of time after the second marriage he gave to each of his married daughters monthly allowances of substantial amounts, although the husband of each was prosperous and amply able to support her in becoming fashion.

The testimony concerning fraud or undue influence exercised over the deceased by Sally S. D. Richards in its aspects most favorable to the contestants and omitting all that of a contrary nature, may be summarized as follows.

The deceased was an active business man, who apparently up to the time of his second marriage was prosperous, keen, alert and self-centered, and used to transactions of considerable magnitude. There was some evidence tending to show that after his marriage in 1911 his powers both of body and mind began to wane. There was uncontradicted evidence as to facts concerning him however, such as falling overboard and clinging to the side of a boat while it was being paddled a mile and a half through the icy waters of a Maine lake in April, 1915, and continuing fishing next day without suffering any ill effects from the experience, which seem incompatible with a weakened condition of body or mind. He continued in control of his business, which demanded considerable self-possession, until after the will of 1915 was executed. One physician testified that the deceased was "a little bit dull and a bit childish about some little things and his mind puerile; . . . in such condition that he could be easily influenced but he thought that Mr. Richards was intelligent enough to understand the matters that entered into the making of wills and disposing of property."

During the year before her marriage, while in company with other young women, one of whom, a daughter of the deceased, said

she was going to marry a young man, Miss Dunbar as she then was, expressed a determination "to marry an old man for his money" and not caring how soon afterward he died. The deceased owned a place in Camden, Maine, dear to him on account of family association, which his wife did not like because it was lonesome and because medical attention in case of sickness was not easily obtainable, and she forced him to sell it. He bought a place in Marblehead in the name of his wife, where they spent the summers in large part after the marriage. He stated on one occasion that he did not care about going to Marblehead, and in reply to the question by one of his married daughters, why he should go, replied, "Because Sally owns both Marblehead and Brookline and if I don't go, she could turn me out;" that Mrs. Hollingsworth had made some kind of a proposition to Sally to come and live with her and that perhaps he might come and live with his daughter. On one occasion the deceased had given directions as to whitening of ceilings and other repairs about his residence, when Mrs. Richards insisted upon more work being done and he yielded to her desires. The deceased said on one or more occasions that his wife felt that she had beeen "snubbed" by his oldest daughter because she would not come to their wedding. He reported that he did not take a trip to Bermuda because his wife did not care to have him go as he could not afford it. Before his second marriage he had said he did not believe in wills and thought the laws of Massachusetts as to intestate succession were just and fair. During his life, he gave to his wife the home in Brookline which he considered worth $25,000, and the Marblehead house, worth $15,000 exclusive of furniture. The deceased said that his wife was having trouble with his two older daughters and they would not come to the house, and he was having difficulty over it at home. There was a vacant lot adjacent to the home of his eldest daughter, Mrs. Porter, which, according to the testimony of her husband, the deceased had promised to give him the preference in buying, and that it was sold without anything being said to him. The purchaser testified that Mr. Richards said to him that his wife wanted him to sell that piece of land, that she did not like the way she was treated and "was going to make it warm for the Porters." Once in conversation over the telephone, when Mrs. Porter suggested that she should use her influence with her father to get him to have a

specialist, Mrs. Richards said, "Go ahead and use your influence and see how far you will go."

The will here in issue is at least the third made by the deceased after his second marriage, and did not differ in material respects from those made before. There was no evidence tending to show that the widow knew the contents or the fact of this will, although the deceased said on one occasion that "his wife, his folks at home had urged him to make another will after." the child was born. To several people he said that he had made a will but had directed "Miss Fallon to destroy" it.

The inventory of the estate of the deceased showed property aggregating about $80,000. There was testimony to the effect that before his second marriage he had said each of his daughters would be worth $100,000. He gave Mrs. Richards an allowance of $300 per month to support the house. He had given his younger daughter prior to his second marriage $225 per month for the same purpose. By his will, after a few pecuniary bequests, his estate was left in trust, out of the income of which an annuity of $600 per year is given to each of his two older daughters and the balance of the income to the widow. On the youngest daughter reaching the age of twenty-one years, the trust is to terminate, and one half given to the widow, and the rest divided equally between the three children, with additional provisions in the event of the decease of any.

This evidence does not warrant a finding that the will was executed through the fraud or undue influence of Sally S. D. Richards. It falls short of showing an imperious and overruling spirit on her part which swayed an infirm and yielding mind into conformity with her desires against its own judgment. The will, while somewhat more favorable to her than the law of intestate succession, does not by itself alone disclose harsh treatment of the two older daughters in view of their married state and in view of the tender age of their youngest sister and the expenses inevitably incident to her nurture and education.

There is no evidence whatever that the will was procured to be executed in any degree by the influence of Mary E. Fallon. She had been bookkeeper and stenographer of the deceased for more than twenty years. She was appointed one of the executrices of his will and given a legacy of $300 and eight shares of stock in a cor-

poration, of the worth of which there is no evidence save that it is marked in the inventory of the deceased as of "value doubtful." There is not a scintilla of evidence that she possessed or attempted to exercise or in fact exerted any domination over his testamentary disposition.

*Exceptions sustained.*