## BESTEIRO et al. v. BESTEIRO et al.
### No. 8689.

Court of Civil Appeals of Texas. San Antonio. Dec. 16, 1931.

Rehearing Denied Jan. 20, 1932.

J. T. Canales, of Brownsville, and Cofer & Cofer, of Austin, for appellant.

H. L. Yates and Seabury, George & Taylor, all of Brownsville, for appellees.

SMITH, J.

This is the second appeal upon the merits in this cause. Besteiro v. Besteiro (Tex. Civ. App.) 18 S.W.(2d) 829. The last trial was had upon the identical pleadings upon which the former trial was had. In the former trial appellant herein recovered judgment. In the last trial her adversaries recovered. We quote this preliminary statement from the opinion of this court in the former appeal:

"In 1918, at the time of the occurrence of the transaction out of which this controversy arose, Julia Perez de Besteiro, now deceased, owned a substantial estate in Cameron county. She had four sons and three daughters, one of whom, Estolia, was married, and the other two, Rosalia and Maria Inez, unmarried. The two unmarried daughters lived with their mother, but the other children lived apart, in their own homes. On May 24, 1918, the mother executed and delivered a general warranty deed, conveying substantially all her property to one of her unmarried daughters, Maria Inez. The recited consideration for this conveyance was that the grantee would take care of, and provide for, her mother, the grantor, during the latter's life time, and give her a Christian burial at her death, and would provide for the remaining unmarried daughter, Rosalia, until she married. This deed of conveyance was filed for record on the day it was executed, and was duly recorded.

"The mother continued, as before, to reside with the two unmarried daughters, and was cared for by them, until she died in 1928, ten years after the execution and registration of said deed. And Maria Inez, the grantee, gave her mother a Christian burial, and provided for her sister Rosalia, until the latter's marriage shortly thereafter. By these means the grantee performed in full the consideration exacted of her in the deed of conveyance.

"The mother died in January, 1928, and in March thereafter all her surviving children other than the daughters Maria Inez and Rosalia brought this suit against the two daughters last named to recover the property conveyed by the deed mentioned above. The suit was brought primarily in the form of trespass to try title, and specifically to set aside and cancel the deed in question. As stated in appellants' brief:

"'The ground upon which the deed was sought to be canceled and set aside was that for many years prior to and at the time of the execution of the deed, and continuously up to the time of the death of Julia Besteiro, deceased, on the 26th day of January, 1928, Julia Perez de Besteiro was a very old woman, feeble in mind and body, suffering from diseases that rendered her weak mentally and peculiarly subject to the power of suggestion, and easily controlled and influenced by those associated with her, and that Maria Besteiro and Rosalia Besteiro, prior to her marriage, had lived constantly for many years prior to the execution of the deed and continuously up to the death of the old lady, with their mother, and by reason of undue influence exercise prior to the execution of the deed, at the time thereof, and continuously up to the death of the old woman, on the part of Maria Besteiro and Rosalia Besteiro, the mother was caused to execute and deliver the deed and to remain inactive up until the time of her death; and by reason thereof the deed was null and void.'"

Judgment was rendered for the plaintiffs in the court below upon the answers of the jury to the following special issues:

"Did Julia Perez de Besteiro, deceased, execute and deliver the deed now in evidence before you by reason of undue influence, if any, exercised by Maria Inez Besteiro and Rosalia Besteiro, or either of them? You will answer this question 'Yes' or 'No.'" To which the jury answered, "Yes."

"Did such undue influence continue to operate on the mind of said Julia Perez de Besteiro after the execution of said instrument, and if yes, for what length of time?" To which the jury answered, "Up to the day of her death."

■ The controlling questions presented in the appeal are embraced in appellant's contentions that appellees' cause of action was barred by limitation, and that there was not sufficient evidence to support the claims of undue influence. Upon the former appeal, the judgment, based on a directed verdict, was at first affirmed, but upon rehearing was reversed upon the "conclusion that the evidence upon the issue of undue influence was such as to raise an issue of fact that should have been submitted to the jury, under proper instructions." It may be said that upon the last trial the evidence was not in all phases substantially the same as that adduced upon the former trial. Nearly all the testimony in the record now before this court relates to transactions occurring subsequent to the execution of the deed in controversy. It was admitted as bearing upon the question of limitation, although not so limited in its operation upon the jury, who no doubt considered it in determining the main issue. Be that as it may, that testimony cannot be given effect in determining the controlling question of whether the claimed undue influence was effectually exerted prior to or at the very time the deed was executed.

■■ The question of Mrs. Besteiro's mental incapacity to execute the deed in controversy is not in the case, either in the pleadings or in the evidence. The only question raised in the pleadings is that of undue influence, which "in its essential elements has no real relation to the ground of mental incapacity." Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138, 1143.

Mental incapacity affords a distinct and complete ground for setting aside a testament, while undue influence affords an entirely different and equally distinct ground for that purpose. Each of the two grounds must be specifically and separately pleaded in order to be available to the party relying thereon. In this case appellees pleaded the former. But they made no effort to plead the latter, and it is therefore not in the case. It should be added that there was no testimony showing any lack of mental capacity in Mrs. Besteiro. There was slight testimony that in her later years she was at times forgetful about some details of her household affairs, and perhaps one or two incidents of forgetfulness of some of the details of her business affairs. But the whole record shows conclusively that at the time this deed was executed she was a highly intelligent woman, of determined will, who knew the condition of her affairs, and what she wanted done in the handling of them, and how to get it done. That was particularly illustrated in the very transaction here involved. When she determined in her mind to dispose of her property, she had her attorney come to her in her home, and there outlined to him her purpose to deed that property to her youngest daughter, Maria, upon condition that Maria would care

for and provide for her during the remainder of her life and give her a Christian burial at her death, and provide for her other unmarried daughter, Rosalia, until the latter married. This conference with her attorney was had in the utmost privacy, in the absence of her daughters and all others. Her attorney suggested difficulties occurring to him in the way of her expressed purpose, or the proposed manner of accomplishing it, but, giving shrewd and intelligent reasons therefor, she insisted upon its being carried out according to her expressed wishes. Her attorney then left, and, after several days spent in assembling data necessary for use in the conveyance, returned with the deed prepared in accordance with her wishes. It was then read over and explained to her, she expressed satisfaction with its terms, witnesses were called in, she executed and acknowledged the intrument deliberately and with the utmost freedom, and it was duly recorded. This was on May 24, 1918. She was 65 years of age at that time. She died ten years later.

■■ Before a testament can be set aside upon the ground of undue influence, it must appear that such influence operated upon the testator at the time of the execution of the instrument: It is not sufficient to show that such influence was exerted prior to that time. The evidence must go further and show that it bore directly upon the testator at the very time the instrument was executed, and destroyed his free agency and "so far controlled and subverted his mind and will power as to render him unable to resist it, and that, in consequence of such inability, the contract was made to reflect and express the mind and will of the person exerting the influence and not that of the" testator. Tex. Jur. Title Contracts § 36, p. 67; Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309, 310. It was said by Chief Justice Fly, in the cited case, that:

"It must also be kept in mind that the undue influence must have acted directly on the mind of the testator at the time of execution of the will. Evidence of influence exerted before that time is admitted only as tending to indicate its existence at the time of execution of the will, and, no matter what the influence may have been prior to that time, if the mind of the testator was untrammeled when he made the will, it must stand."

We conclude from the record that there was not more than a scintilla of evidence, if there was any at all, to support a finding of undue influence exerted upon Mrs. Besteiro prior to or at the time she executed the deed in controversy. On the contrary, it may be said that the uncontroverted testimony shows conclusively that at the time she executed the instrument she acted wholly of her own free will and accord, with full knowledge and appreciation of her act and the effect it would have upon her estate. There was no evidence that she was acting at that time under any

influence other than that of her own conscience and judgment, and the high purpose of providing for her youngest daughter while securing her own peace and comfort during the remaining years of her life.

The ·deed was drawn by her counsel, J. T. Canales, Esq., a reputable attorney, after a long conference she had alone with him upon her own initiative several days prior to the execution of the instrument. Mr. Canales, after detailing previous transactions in which he performed legal services for her, testified:

"The next occasion I had to have any business dealings with Mrs. Besteiro, as I recollect, was the next year following my first visit down there. At that time I received a telephone message at my office from the Besteiro home, and the message was that Mrs. Besteiro wanted me to go to the house, as she wished to consult me about some matters. In response to that telephone call I went down to see her. I went in and sat down and presently Mrs. Besteiro came in and we sat down there for something like an hour. During that conversation as I remember there was no one else present. She then told me she wanted to execute a deed to her daughter Maria, conveying all her property to her on condition that Maria was to take care of her during her natural life and to give her a Christian burial, and also to take care of her unmarried sister, Rosalia, until she should get married. At that time I did not know and had not met Maria, but Mrs. Besteiro had told me of some trouble she had had with a son in law by the name of Gonzalo Diego, and I said to her that I thought it would not be a proper thing to do for the reason that Maria might marry somebody like that other daughter had and get her into trouble. She said, 'No, I know my daughter Maria, she will not marry; she will take care of me until I die; I will not trust the other one'—meaning Rosalia—'I know she will marry, but my daughter Maria will do what I tell her to do.' Then I cautioned her to the fact that a deed of that kind might bring her some bad consequences, and then I suggested to her why did she not execute a will in favor of Maria, and in that way she would have control of her property and there would not be any danger. She said, 'I don't want a will, I have been advised that a will is broken after the person dies; I want to make a conveyance to her while I am living so that I can protect her from her brothers.' 'Well,' I said, 'It appears you know what you want to do, and I will go and draw the deed in the form in which you want it.' She told me a story about the family affairs that I do not distinctly recollect, but the substance of it was that all her sons had been provided for and were well to do and that Maria was going to remain unmarried and she wanted to see that she would be provided for.

"I remained down there for quite a while and then went to my office. * * * So it took me several days, I know as much as three days—I couldn't tell you exactly how many, studying the nature of the deed and getting this data. After I drew the deed and dictated it to Miss Counsuela Tijerina, who was working for us, and who is a cousin of mine. I dictated it and she typed it, and I have here in my files a carbon copy of that deed, the original of which has been introduced in evidence.

"After the deed was prepared I then called the house—they had a 'phone at that time—and I 'phoned them I would be there at a certain hour, I think about ten o'clock in the morning, and I took Counsuela with me, who was a notary public, to act as a notary public in this transaction. We went to Mrs. Besteiro's house, I knocked at the door and Rosalia opened it and showed us to a room that is on the south side, and I told her I had the instrument there and I thought it would require some witnesses to be present when it was executed. * * *

"I asked them whether they had any witnesses, and the name of Miss Samano, Mrs. Miller now, was suggested, and I inquired whether she was twenty-one years old, and ascertained that she was, and so I told them to call her as a witness, and so then we waited there until she came in. When I had gone in I had introduced Miss Tijerina to Mrs. Besteiro, and told her she was my stenographer, and was also a notary public, whom I had brought to take her acknowledgment. She asked me if I was a notary and I told her yes, and she then said she wanted me to take ·her acknowledgment and let Miss Tijerina sign as one of the witnesses. It is a fact that in connection with transactions of this character in Mexico a notary public is a much more formal officer than he is with us. Anyway, Mrs. Besteiro requested that I should act as notary instead of as a witness, and so then when Miss Samano came in I read the instrument, first in English, so that she would know what it was—I knew that she spoke English—and then I translated the instrument in Spanish, as near as I could verbatim, but usually in instruments of this kind it is impossible to follow the exact language. I gave the effect of it and explained the instrument in the presence of the two witnesses and Rosalia. I don't know whether Maria had come in by that time or not, but I know she came in during the time we were having the instrument executed. After I explained it I asked her whether it was what she wanted and she said yes, that is exactly what I want. I said, 'Now come and sign it,' and Mrs. Besteiro said it was very difficult for her to write her name, would it be better that I call one of the girls for me and let her do that, and I asked her could she sign and she said yes, and I told her to go ahead and take her time, that it was very important for her to sign the instrument. So she went to the table and they brought in

the pen and ink, and she wrote her name slowly, as it appears on the instrument now. I stood like I am standing by the reporter, right back of her and watched her while she wrote her name, 'Julia P. de Besteiro,' and after that Miss Samano signed as a witness and then Counsuela Tijerina signed as a witness, and then I took her acknowledgment in the presence of all of them, and I had a seal that either Counsuela or myself had taken, and I affixed the seal and left the instrument with her."

This testimony of Mr. Canales is uncontradicted in the record. As to what transpired on the occasion of the execution of the deed, his testimony is supported in its material details by that of the two subscribing witnesses to the deed, and is opposed neither directly nor indirectly by any other testimony in the record. So that whatever the evidence may show concerning facts and circumstances and transactions occurring prior or subsequent to the execution of the deed, they do not warrant the setting aside of the instrument upon the ground of undue influence, in the absence of a further showing that such influence dominated the grantor at the time she executed the deed. There is no such showing in this case, no pretense of it, and therefore the jury finding upon the principal issue cannot be sustained.

But the evidence does not show the existence or exercise of undue influence at any time prior to the execution of the deed, sufficient or even tending to show that the will of Mrs. Besteiro was overcome by the influence of her daughters and theirs substituted therefor so as to make the act the product of their will in the place of hers, as will be seen from the evidence now to be set out.

Appellees' chief witness on the issue of undue influence was the godchild and former house servant of Mrs. Besteiro. This witness testified that she went to work in the Besteiro home some time in 1918, but it does not appear that this was before the date of the execution of the deed, which was on May 24 of that year. It may easily be inferred that that event transpired prior to her association with the family, for she did not mention it in her testimony, in which she related the most intimate details of the family life, conditions, conversations, and habits. She did not testify to a single incident in which the daughters sought to influence their mother in the matter of disposing of her property. She never heard them mention the subject to their mother. She testified:

That while she was working there (whether before or after the deed was executed is not shown) Jose and Manuel, two of the Besteiro sons, appellees here, "came there to visit their mother one time. Alberto (another son, and appellee) came to the house one time while I was there," but did not get in because his mother was praying. That his mother prayed about three or four hours every day. That he "knocked at the door and Rosalia told him he could not come in because his mother was praying." That it "was the custom of the family not to disturb her while she was praying. While she was praying no one spoke to her." That when Alberto came there to see his mother she did not open the door for him because the girls told her to tell him his mother was busy. That "the girls disliked it very much when Alberto came there. They would say 'These fellows are coming up here to come around, and we are not going to give them anything.' The only conversation I ever heard between Rosalia and Maria with reference to their Mother's property was that they were going to put everything in their names. I heard that conversation between them when Don Jose and Don Manuel were there. I would only hear that kind of conversation between the sisters when the boys were there. I never did hear any conversation between the two girls and their mother with reference to the mother's property, just that they were going to arrange everything before she died.

"When Jose and Manuel came there the girls did not welcome them, they would get angry because the boys were there. They would say these fellows are coming around now and we ought not to give them anything, and after the boys left My Godmother told the girls, 'Daughters, don't fight, they are your brothers.' And then she left them and came in the kitchen where I was and I asked her if the boys had left and she said yes, they had left, but I am weary and depressed about this because the girls don't want them to come to the house. When she said the girls didn't want them to come to the house I said to her, 'You want them to come don't you, Godmother?' and she said: 'Of course, why shouldn't I want them to come, they are my sons, they were born in the same womb where my daughters were born.' My Godmother said she could not get the girls to get along with their brothers. Rosalia, with reference to the situation in the house, was generally in control and gave the orders. A leaf could not be moved on the trees unless Rosalia said so. She controlled her mother.

"When my Godmother was walking and praying she would walk very slow, and she prayed morning and evening. She liked to go out in the garden and walk around. When I was there she did not do any cooking, she wanted me to cook. She never did scold anyone. She was a very fine and lovely old lady, and was always good to every one, and when she did not see her sons she would ask about them.

"I said that Rosalia was mistress of the house, and I meant that she looked after the cooking and getting the groceries and telling me what to do, and if there was anything to

be repaired or grass to be cut she was the one who ordered it done. Maria was a very quiet girl and didn't say anything. Neither Maria nor Dona Julia talked very much, but they were both intelligent women. Rosalia was the mistress."

She further testified that "the brothers that I knew were (appellees) Jose, Manuel and Alberto. When I first knew those three boys they were all married men and had children, so my Godmother told me, but I did not know their children. She loved her sons a great deal."

Another witness for appellees testified that:

"In January of 1918, while I was working for Jose, he sent me to his mother with a package for her. I took the package to the house, but Rosalia received it. I said to her, "Don Jose sends this package', and she said, 'Bring that bundle here. My mother is going to will in my favor.' I don't know how come her to say that. After that, she began to talk about her brothers Jose and Manuel. She did not say whether she was pleased about this present for her mother. She did not send back any message for me to take back to Jose. When I gave the package to her, she said, 'Give me that. That pride will soon finish. She is going to will us the property.'"

■ Appellant's brother, who are appellees here, testified at length. Much of their testimony related to transactions and conversations they had had with their mother. This testimony should have been excluded under article 3716, R. S. 1925, but was admitted without objection. Nevertheless, whether objected to or not, it was incompetent to support a verdict or judgment. Henry v. Phillips, 105 Tex. 459, 159 S. W. 533. But their whole testimony, whether competent or not, in so far as it related to transactions prior to the execution of the deed in question, was not sufficient to support a legal finding of undue influence. At most, it was but a recital of family quarrels, and of small and isolated incidents of Rosalia's spitefulness. As for that, the record shows that Rosalia distrusted appellees, accused them of seeking pecuniary favors of their mother, and resented their visits to the latter. But that character of testimony was not sufficient to support the charge of undue influence in the absence of other specific facts or circumstances supporting such charge. We will here set out their testimony relating to matters occurring prior to the execution of the deed:

Jose Besteiro, a son of Mrs. Besteiro and one of the appellees, testified:

"When my father died, the money was divided between the children and my mother, but the real estate was left to my mother. After I married and established my home, I would go to see my mother every Sunday until up about 1916, the relationship between my mother and I was very good. I believe that change began about 1915. That change in the relationship was because of trouble in the family—Rosalia. * * * That trouble was brought about because they did not want me to go to see my mother. I always thought it was Rosalia who did not want me to go to see my mother. The other one (Maria) never speaks. Rosalia would argue a great deal and become unfriendly, and then I would get my hat and leave, and everything resolved itself to this: They didn't want me to see my mother because they believed she was going to divide the property among us. I wanted to go see my mother because she was my mother. If I couldn't see my mother, why should I see anyone else. I loved my mother. I owed it as a duty to go to see my mother, and on the other hand, I wanted to help her, to lighten her work. * * * Many times they called me a thief. She did that in the presence of my mother. When Rosalia would call me a thief, neither my mother nor Maria would say anything. What my mother would do would be to become distressed, and it shortened her life. When Rosalia would say that to me, we would argue a while, and then I would get my hat and leave. I stopped going to see my mother, because I did not want to worry her and have it weigh on her, and did not want to cut short her lifetime further."

Another son, Alberto, testified:

"I would go to see my mother every Sunday up until 1918. The last time I went there they turned the door on me and did not want me to go in. Maria closed the gate. I saw her when she ran and put the lock on the gate when she saw me coming. That was the gate to the little garden that goes to the house. You had to go through that gate to get to the house. I tried to get in after they closed the gate. I knocked on the door and called them. They never opened the door. I could hear them talking in the house, but they would not open the door. I stayed there at the door probably five or ten minutes. It made me sad for the sisters to lock the door and not let me see my mother, because I wanted to see her because I loved her. After that time, I went back there again every Sunday for eight or ten weeks, and they never allowed me to go see my mother. I would go there and knock at the door, and call them, and they never came and opened the door. After that, I quit going because there was no use, as I could not see my mother. * * * Rosalia and Maria never did tell me why they did not want me to come there to see my mother, but I heard both of them talking several times when I was there to see my mother. They would be in a room near my mother and I, and I would hear them talking. They were talking about me and Manuel and Jose. They said we were thieves and wanted to rob them of their capital."

Another son, Manuel, testified:

"The change began about 1916 or 1917. Up to that time, the relations with my mother and sisters, and with all the brothers, had been all right. Up to that time, I would go to see my mother every Sunday, and I used to go in my car and take them out most every Sunday, in the country or anywhere they wanted to go. After that time I did not go there to take them for a ride * * * because I commenced to notice then that I was not welcome at the home when I would go there. It was the girls·who did not extend me a welcome when I would go there, Rosalia and Maria, mostly Rosalia. The girls used to keep listening in the other room when I would meet my mother. They would commence to talk from the other room, and they would say, 'Why don't that man go. Why does he come here. He has nothing to do here. He ought not to come. He has got no business with my mother.' It would be Rosalia and Maria saying that, mostly Rosalia. My mother used to call them down, and I would tell my mother, why is it these girls don't want me to come here, and she would say she did not know, and that was why she did not receive me with so much pleasure, because they get mad at me and are always telling me I should not allow you to come here, and things like that. After I began to hear these conversations, I eventually almost quit going to the house. I ceased to go there about 1917, for the reason I have already told you. I wanted to go there because I loved my mother and wanted to see her."

Martin, another son, testified:

"During the time my mother·was living, there was a change in the relationship between my mother and my sisters and I. * * * It must have been about 1910 or 1911, as near as I can recall. During the time I was in charge of her affairs, everything was very pleasant, but after that I could see an air of indifference toward me by my sisters. They acted indifferent and unfriendly. When I would go there, they would not speak to me, and if I discussed anything. with my mother, they would take part in the conversation in a rather disagreeable way, try to get into an argument, and make it disagreeable all the way through."

■ We have set out all the testimony covering transactions occurring before and at the time of the execution of the deed, in so far as the same may bear upon the charge of undue influence. We are of the opinion that such testimony does not raise the issue of undue influence. It amounts to no more than proof that Rosalia and Maria Besteiro disliked and distrusted their brothers, suspected them of designs to get more money from their mother, resented their visits to their mother, as intended to further those designs, and made those visits so disagreeable to them that they discontinued them. That charac-

ter of testimony was not sufficient to warrant a jury in finding that the two younger daughters unduly influenced their mother to deed her property to the youngest daughter for the consideration recited in the deed, which conditions were shown to have been fully performed by the grantee. There is no evidence that the two girls ever even suggested such conveyance to their mother, either directly or indirectly, or that their antagonism to their brothers had any material effect upon the mother's attitude to her sons, or impaired her affection for them. On the contrary, appellees' own testimony, and that of their other witnesses, showed that the mother resented the attitude of her daughters towards her sons; that she upbraided the girls for that attitude, and that through all the miserable quarrels among her children she loved them all as her children, or, as expressed by her to her godchild and servant (one of appellees' witnesses), when asked if she wanted her sons to come to see her, she said, "of course, why shouldn't I want them to come? They are my sons. They were born in the same womb where my daughters were born." The same witness testified that the mother "loved her sons a great deal," and that "when she did not see her sons, she would ask about them." It is true that Mrs. Besteiro lived much alone with the two girls, and usually went out only with them, and in that way her association was almost exclusively with them, although her neighbors and a married daughter often came in to see her, as did persons with whom she had business dealings. But this disposition to be alone with her daughters was not unnatural in all her circumstances. She was afflicted with a malady peculiar to her sex, which seemed to make her timid about going out. She was deeply religious, and spent much of her time in the home and in her garden, telling her beads, in meditation and prayer. All her other children were married and widely scattered, living their own lives, in their own homes, in their own ways. She considered them established and settled and well cared for. What, then, was more natural than her desire to cling to and provide for Maria, her youngest daughter, who was unmarried and did not intend to marry, and has not yet married, after thirteen years? Rosalia, the next youngest daughter, was soon to be married, and did marry about a year after the deed was executed. It was not wholly unnatural, by any means, that in such situation the mother should convey all her property to Maria, upon condition that the latter provide for and take care of her during the remaining years of her life, give her a Christian burial, and provide for Rosalia until she married.

■ Appellees stress the contention that because the girls were so constantly and closely associated with their mother they had ample opportunity to influence her to make

this deed against her will. It is true this association was very close, but not unnaturally so, as has been pointed out. Such association and the consequent opportunity can be given no weight upon the issue of undue influence, in the absence of a substantial showing that those girls in fact effectually prostituted those relations and associations to the sinister purpose of overwhelming the will of their mother, substituting their own therefor, and wheedling or browbeating her into making a deed which she would not have made but for such baleful influence. The testimony in this case cannot be reasonably given such effect. Those relationships and associations were natural; they were commendable, and a mere showing that they existed will not warrant the courts in finding or presuming that they were perverted to the sinister uses here charged by appellees, and upon such finding or presumption decree the cancellation of the deed here shown to have been deliberately and voluntarily and solemnly made in pursuance of a sustained purpose previously formed in the apparently unhampered mind of the grantor.

In view of reversal upon other grounds, we see no occasion to discuss the subject of limitations at length. Appellant contends that this question should be determined as in cases of fraud, in which the statutes operate from the time a fraudulent transaction is completed, or as soon thereafter as the victim acquires knowledge of the fraud perpetrated upon him, or could have acquired such knowledge in the exercise of diligence. We are of the opinion that this rule should not be applied in cases of undue influence, notwithstanding such cases have elements of fraud in them. But undue influence partakes more of the nature of duress, in which limitations ought not to begin to operate upon the victim so long as he remains powerless to assert himself against the influences which subjected his will to that of his tormentors and forced him to do the act from which he seeks relief. This question of limitations, as applied to cases of undue influence, seems never to have been decided in this state. None of the cases cited by appellant appear to be applicable. But the conclusion we have stated is supported by other authorities. 37 C. J. § 321, p. 949, and authorities there cited.

Appellant also raises the question of the sufficiency of appellees' pleadings, which need not be here decided. Suffice it to say that we think appellees' pleading to recover the money judgment obtained by them properly belonged in an amended rather than in a supplemental answer. Certainly this was required by the better practice, if not by positive rule.

We conclude that there was not sufficient evidence of undue influence to warrant the setting aside of the deed in question, and,

as it is apparent the case has been fully developed, it is our duty not only to reverse the judgment appealed from, but to here render judgment for appellant. It is so ordered.

Reversed and rendered.

### On Motion for Rehearing.

Appellees earnestly press their very able motion for rehearing, in deference to which we have reviewed the record, which was thoroughly studied, and seriously considered in the original disposition of the case. And while we are deeply mindful of the duty to affirm where that may be done with reasonable consistency, yet we are unable to avoid or escape the conviction that the record does not warrant a judgment setting aside the deed in controversy, which was so deliberately executed by the grantor with apparently the utmost freedom from the controlling influence of others. Candor invokes the statement that such conviction was present in the mind of the court in the original disposition of this important case on the former appeal, but was put aside for the time on rehearing, largely upon the theory that justice might be better served by allowing appellants another opportunity to develop their cause. They did not, in our opinion, make as strong a case upon the last trial as upon the former; or, at least, our original conviction that appellants have no case has been sustained, if not strengthened, by the record now before us. Appellees call our attention to the erroneous statement in the original opinion that Maria Besteiro is the younger of the two daughters against whom is brought the charge of exercising undue influence upon their mother. It appears that Rosalia, and not Maria, is the younger of the two, and we now make that correction. The error is deemed immaterial here, however. Maria's quiet and unassertive nature and disposition, her apparent inclination, or determination, to remain unmarried, seemed to appeal to her mother who, by reason thereof, selected her as the one on whom the latter could best rely for companionship and solace and support during the remainder of the mother's life, and as the one most entitled to the mother's bounty.

Appellant has also filed a motion for rehearing upon some of her assignments of error, but we see no reason for change in the original opinion upon the points raised. Appellant complains, particularly, of the statement in the original opinion that the testimony of appellees concerning transactions with the decedent was admitted without objection from appellant. Appellant points out that the record shows this testimony was in fact objected to by appellant at the time, but was admitted over those objections. This ruling was not complained of in the appeal, however, and must therefore be treated on appeal as having been waived by appellant, as

though the evidence was admitted without objection.

With these modifications of the original opinion, both motions for rehearing are overruled.