VIRGIL D. HOWE *vs.* RONALD F. PALMER & another.[1]

No. 10-P-295.

Franklin. April 5, 2011. - October 31, 2011.

Present: TRAINOR, SMITH, & MEADE, JJ.

*Real Property,* Deed. *Undue Influence. Limitations, Statute of. Emotional Distress.*

At the trial of a civil action alleging that a deed from the plaintiff to the defendants was the product of undue influence, there was no merit to the defendants' contention that, even if one of them unduly influenced the plaintiff, the deed was nevertheless enforceable by the other because they each had separate enforceable legal rights in the deed [740-742]; further, where the plaintiff not only did not realize that he had been harmed but also was actually convinced (by the defendants' undue influence) to believe that execution of the deed was the correct action to take, the applicable statute of limitations did not operate to bar the plaintiff's claim [742-745].
The evidence at the trial of a civil action amply warranted a jury verdict in favor of the plaintiff on his claim that one defendant had intentionally inflicted emotional distress. [745-746]

CIVIL ACTION commenced in the Superior Court Department on March 1, 2006.

The case was tried before *Daniel A. Ford,* J., and a motion for judgment notwithstanding the verdict was considered by him.

*Mark A. Tanner* for the defendants.

*Michael R. Rawson* for the plaintiff.

TRAINOR, J. The defendants, Ronald F. Palmer and Jeanette M. Palmer (collectively, Palmers), appeal from a jury verdict finding that a 2000 deed from the plaintiff, Virgil D. Howe, to the Palmers was the product of undue influence and that the Palmers had intentionally inflicted emotional distress on Howe. In answer to special questions, the jury found that Howe did not know

---

[1]Jeanette M. Palmer.

nor should he reasonably have known prior to March 1, 2003, that he had been harmed (for purposes of applying the discovery rule and the statute of limitations) and that he did not unreasonably delay bringing suit so as to prejudice the Palmers. Judgment entered rescinding the deed and awarding damages for emotional distress in the amount of $60,000 plus interest and costs. The Palmers appeal the judgment, arguing that the trial judge should have allowed their motions for a directed verdict as to the two claims, as well as their motion for judgment notwithstanding the verdict. We affirm.

*Background.* We recite the facts the jury could have found. Howe owned a farm in Deerfield, an inheritance from his mother. His wife, Esther, was not on the deed. By all accounts, Howe is a simple man with severe dyslexia and slow mental processing. These issues contributed to a difficult childhood where he was treated harshly and subjected to severe discipline by school administrators, as well as being teased and bullied by his peers and classmates. As an adult, he was easily intimidated; in fact, Ronald Palmer (Palmer) testified that because Howe is "who he is," "he could be made to go along with things he may not really want to go along with."

The Palmers befriended the Howes in the mid-1990s and Palmer became Howe's only friend. Howe confided in Palmer concerning his (Howe's) weak financial position and his fear that he would lose his farm, "his inheritance." Palmer offered to help and advised Howe to pray on it. In the fall of 1998, the Palmers spent one week on the farm with the Howes. The Palmers asked a lot of questions about expenses and about Esther's children from her two previous marriages. After the Palmers spent their "trial" week with the Howes, Palmer told a friend, "[G]ive me a year and I'll have my retirement." Ultimately, by agreement, the Palmers moved into the Howes' home in January or February, 1999, to share expenses for a period of six months to one year. The inside of the house was cluttered and dirty, and the outside was littered with abandoned and rusting vehicles and other machine parts. Apparently the house was uninsurable.

In the spring of 1999, the parties started cleaning up the property, but Howe was a somewhat reluctant participant.

During "house meetings," Palmer intimidated Howe about the cleaning, forced him to part with items he desired to keep, and yelled at him to keep his word and to speed up his work. Howe became uncomfortable living with Palmer and found it difficult to face him when he came home from his job working on the adjacent farm. Although Palmer professed that he never expected to be paid for the work he did cleaning up the Howe home and property, he decided unilaterally to take a "commission" on the profits of a tag sale the parties held in the summer of 1999. Jeanette Palmer kept the balance of the proceeds for household expenses. In addition to the tag sale, more than fifteen tons of "junk" was removed by a junk hauler. Howe never was informed how much, if any, money was realized from that transaction. Howe, fearful of Palmer, did not protest.

Despite the fact that there was no such agreement before moving onto the farm, after six months, Palmer convinced Howe that he owed him $20,000 to $25,000 for his (Palmer's) assistance in cleaning up the property, and that the only way Howe could settle his debt was to sell the farm or convey a fifty percent interest in it to the Palmers. Howe agreed to do so because he "felt like there was no other option." Jeanette contacted a lawyer, and on March 7, 2000, Howe signed a deed giving the Palmers a fifty percent interest in the property as his joint tenants by the entirety,[2] subject to a life estate for Esther. Although the lawyer inquired as to separate representation for Howe, Howe did not have the money for such representation. Howe had ongoing feelings of "fear and intimidation" at the time the deed was executed.

It is unclear exactly when, but at some point in 2000, the parties and Esther decided to create a Christian ministry on the farm, and called it "Shepherds Haven." Through a correspondence course, the Palmers became ministers of Full Gospel International of Pennsylvania. They had a "spiritual board" of four to five people at the farm.

On November 9, 2000, Howe signed a document agreeing to be counselled by Reverend Carol Pomeroy. He also agreed

[2]As so written in the deed.

that if he could not "change" himself by March 31, the ministry would be disbanded. Those who wished to continue the ministry to God would leave the farm, and Howe would reimburse them financially for all the time, effort, and work they put into the farm.

Howe's stepdaughter, who was concerned when she learned about the deed to the Palmers, had a discussion with Howe around the time the deed was signed. During the discussion, he told her that he "had been having a bad attitude about everything that was going on at the farm" and asked her to "pray that his attitude would change." He also told her he was "in counseling" with Pomeroy, a friend of the Palmers, and "that he now felt that what was happening out there was okay." The Palmers told Howe that his prior pastor was not "Holy Spirit filled" and, therefore, would not be an appropriate counsellor. In addition, they forbade Howe to tell anyone outside of the ministry what went on at Shepherds Haven. Palmer yelled at Howe if Howe did not support him without question, and the jury could have found that the counselling was designed to change Howe's behavior and his resistance to cooperating with, and being "loyal" to, Palmer. Esther testified that she and Howe were "learning to submit," to be "loyal," and to "[go] along with [Palmer's] leadership." Pomeroy reported to Palmer upon completing each session with Howe.

John Morris, a friend of Palmer who spent several months on the farm in 2001, described Palmer's treatment of Howe as "constant intimidation, belittlement — degradation." Tensions continued between Howe and Palmer from 2002 through 2005. Palmer told Howe he had the attributes of "Satan," which caused Howe to become depressed. Palmer eventually suggested that Howe ask his boss if he could live in a camper on the boss's farm. On July 16, 2005, Howe packed his things, asked his wife if he could use her trailer, and moved to the neighboring farm. Shortly before he left, he resigned from the board of Shepherds Haven, stating that he had let fear control his life. Palmer made him rewrite the resignation letter eliminating any reference to fear.

Some months later, Howe and his wife reconciled despite

the Palmers' efforts to keep them apart by telling Esther that Howe had abandoned her. Esther eventually left the property as well, and this action was commenced on March 1, 2006, less than one year after Howe left the property.

*Discussion. Undue influence.* It is well established that the obligations of documents such as deeds, wills, and contracts can be avoided by showing that they were procured by means of fraud or undue influence. See, e.g., *Brodie* v. *Evirs,* 313 Mass. 741, 744-745 (1943); *Henchey* v. *Cox,* 348 Mass. 742, 746-747 (1965); *Bruno* v. *Bruno,* 384 Mass. 31, 33-34 (1981); *Tetrault* v. *Mahoney, Hawkes & Goldings,* 425 Mass. 456, 464 (1997). Fraud and undue influence are separate and distinct grounds for invalidating such documents, and their proof proceeds from different theories. See generally *Wellman* v. *Carter,* 286 Mass. 237, 253 (1934). In the case of fraud, the victim proceeds of his own free will but is affected by a false representation of a fact that induced the execution of the document. *Ibid.* Undue influence, however, creates a situation where the victim's own free will is destroyed or overcome such that what he does, his action, is contrary to his true desire and free will. *Neill* v. *Brackett,* 234 Mass. 367, 369-370 (1920). *Wellman, supra. Rood* v. *Newberg,* 48 Mass. App. Ct. 185, 191-192 (1999). We are dealing here with a claim of undue influence. The party challenging the validity of the document, on the ground that it was procured and executed as a result of undue influence, bears the burden of proving the allegation by a preponderance of the evidence.[3] See, e.g., *Cleary* v. *Cleary,* 427 Mass. 286, 290 (1998).

Undue influence has been defined to mean "whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammelled desire." *Neill,* 234 Mass. at 369. There are numerous means by which undue influence may be exerted upon an individual. The means may be overt or subtle, and one method is no more determinative of the outcome than another. Undue influence "may be caused by physical force, by duress, by threats, or by importunity. It may arise from persistent and unrelaxing efforts in the establish-

---

[3]This burden shifts when a person in a fiduciary relationship with the grantor or principal benefits from the transaction. *Cleary* v. *Cleary,* 427 Mass. 286, 290 (1998).

ment or maintenance of conditions intolerable to the particular individual. It may result from more subtle conduct designed to create an irresistible ascendancy by imperceptible means. It may be exerted either by deceptive devices, or by material compulsion without actual fraud. Any species of coercion, whether physical, mental or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence." *Ibid.* Our analysis is made easier when dramatic or overt means are employed, but ultimately the nature, extent, or degree of the means employed "is inconsequential so long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the person signing the instrument. Any influence to be unlawful must overcome the free will and eliminate unconstrained action. The nature of fraud and undue influence is such that they often work in veiled and secret ways. The power of a strong will over an irresolute character or one weakened by disease, over-indulgence or age may be manifest although not shown by gross or palpable instrumentalities." *Ibid.*

"Four [factors] are usually present in a case of undue influence: '. . . an (1) unnatural disposition [is] made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.' " *Rostanzo* v. *Rostanzo*, 73 Mass. App. Ct. 588, 604-605 (2009), quoting from *O'Rourke* v. *Hunter*, 446 Mass. 814, 828 (2006). A claim of undue influence therefore can be made out upon a showing that a third party, here Palmer, "by means of coercion, overpowered the mind of the [victim, here Howe,] and caused him to [sign a document] that embodied [Palmer's] 'dominating purpose' rather than the 'wishes of the person signing the instrument,' i.e., [Howe]." *Id.* at 604, quoting from *Neill, supra.* See *Wellman,* 286 Mass. at 253; *Rood* v. *Newberg,* 48 Mass. App. Ct. at 191-192.

The Palmers do not now contend, nor did they at trial, that there was insufficient evidence to support a finding that the deed was procured by undue influence.[4] Rather, the Palmers

---

[4]The jury answered "yes" to the special question whether the deed was the product of undue influence "by Mr. *or* Mrs. Palmer" (emphasis supplied).

argue that even if one of them unduly influenced Howe, the deed should be enforceable by the other because they each have separate enforceable legal rights in the deed.[5] It is well settled, however, that an instrument procured by undue influence is voidable by the person who was unduly influenced. *Willett* v. *Herrick*, 258 Mass. 585, 603, cert. denied, 275 U.S. 545 (1927). Howe has not ratified the deed, so neither of the Palmers would have any right to its enforcement if the statute of limitations is determined not to prevent the claim of undue influence.

*Discovery rule.* In the alternative, the Palmers argue that an undue influence claim must fail because of the applicable statute of limitations. A claim for undue influence sounds in tort, *Brignati* v. *Medenwald*, 315 Mass. 636, 636 (1944), and actions in tort have a statute of limitations of three years under G. L. c. 260, § 2A. This statute of limitations applies notwithstanding the fact that undue influence is an equitable claim, as statutes of limitations apply to both legal and equitable claims. *Jackson* v. *Arooth*, 359 Mass. 721, 724 (1971).

Here, the deed was executed on March 7, 2000, and the complaint was filed on March 1, 2006. Howe, however, proceeds under the discovery rule, which states that "the statute of limitations starts when the plaintiff discovers, or reasonably should have discovered, 'that [he] has been harmed or may have been harmed by the defendant's conduct.'" *Koe* v. *Mercer*, 450 Mass. 97, 101 (2007), quoting from *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 205-206 (1990). The Palmers, of course, argue that because Howe participated in the execution of the deed, he had actual knowledge or should have known that he had been harmed by their conduct. The Palmers ignore, however, the potential impact of the undue influence on Howe's ability to know that he had been harmed, particularly under the extreme circumstances of this case. Because a limitation period is tolled until a plaintiff has, "first, an awareness of [his] injuries and, second, an awareness that the defendant caused [his] injuries," *ibid.*, quoting from *Doe* v. *Creighton*, 439 Mass. 281, 283 (2003), we must determine whether, as a result of the undue influence,

---

[5]The Palmers advance this argument without citation to any authority from this or any other jurisdiction.

Howe was unaware that he had been harmed, and consequently unaware that the Palmers had caused the harm.

The concept that a person who has been unduly influenced may not appreciate that he has been harmed nor comprehend the source of the harm is not a recent legal theory. "It is obviously reasonable to conclude that the influence which vitiates the act of the person over whom that influence is exercised should also, as long as it lasts, excuse the omission of that person to complain of that act obtained by such influence. It is quite different from cases where the parties are opposed to one another." *Sharp* v. *Leach*, 54 Eng. Rep. 1229, 1234-1235 (1862). The general rule, from the time of this and other early cases, has been that the statute of limitations is no longer tolled after the removal of the duress or undue influence, and that after the undue influence has ceased, the statute begins to run. See, e.g., *Durazo* v. *Durazo*, 19 Ariz. 571, 576 (1918). Additionally, the doctrines of fraudulent concealment and duress both are available to toll the statute of limitations for claims under the Federal Tort Claims Act, 28 U.S.C. § 2401(a) (2006). See *Rakes* v. *United States*, 442 F.3d 7, 25 (1st Cir. 2006). Many State jurisdictions also allow the limitations period to be tolled as long as the undue influence persists.[6]

Generally, if a reasonable person in the plaintiff's position would have recognized the harm, or the cause of the harm, the limitations period will begin to run. In determining what constitutes a reasonable person, "[i]ndividual variations in judgment, intellect, or psychological health which are *unrelated* to the complained of conduct are not considered" (emphasis supplied). *Riley* v. *Presnell*, 409 Mass. 239, 245 (1991). For the

[6]See, e.g., *Spiva* v. *Boyd*, 206 Ala. 536, 539 (1921); *Mullins* v. *Barrett*, 204 Ga. 11, 15 (1948); *Hughes* v. *Silvers*, 169 Iowa 366, 376 (1915); *Howard* v. *Carter*, 71 Kan. 85, 91 (1905); *Eureka Bank* v. *Bay*, 90 Kan. 506, 509 (1913); *Bither* v. *Packard*, 115 Me. 306, 315 (1916); *Aldrich* v. *Steen*, 71 Neb. 33, 52 (1904); *Oldham* v. *Oldham*, 58 N.C. 89, 92 (5 Jones Eq. 1859); *Little* v. *Bank of Wadesboro*, 187 N.C. 1, 6 (1924); *Besteiro* v. *Besteiro*, 45 S.W.2d 379, 386 (Tex. Civ. App. 1931), aff'd, 65 S.W.2d 759 (Tex. Comm'n App. 1933); *Cadena* v. *Cadena*, 223 S.W.2d 678, 681 (Tex. Civ. App. 1949); *McNeill* v. *Lovelace*, 529 S.W.2d 633, 637 (Tex. Civ. App. 1975). Contra *Marshall* v. *Packard-Bell Co.*, 106 Cal. App. 2d 770, 774 (1951); *Adoption of Sewall*, 242 Cal. App. 2d 208, 218 n.1 (1966); *Keyton* v. *Downey*, 81 Ind. App. 431, 432-433 (1924).

purposes of a claim of undue influence, "[t]he reasonable person who serves as the standard in this evaluation, however, is not a detached, outside observer assessing the situation without being affected by it. Rather, it is a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint." *Ibid.* A reasonable person is defined and evaluated as someone in the position of the plaintiff. "If such an initially reasonable person would, by reason of the experience forming the basis for the plaintiff's complaint, have his or her judgment altered in some way, such altered judgment then becomes the standard. The cause of action will not accrue until such an individual would have discovered the damage. In other words, if the defendant's conduct would, in an ordinary reasonable person, cause an injury which by its very nature prevents the discovery of its cause, the action cannot be said to have accrued. Accrual of the cause of action occurs when the ordinary reasonable person who had been subject to the experience would have discovered that the injury was caused by that experience." *Id.* at 245-246. Such is the case here, as Howe not only did not realize that he had been harmed, he was actually convinced (by the Palmers' undue influence) to believe that he had harmed the Palmers and only could make them whole by transferring to them an ownership interest in the farm.

The expert testimony presented by Howe was somewhat ambiguous. However, what the jury heard on both direct and cross-examination was that Howe did not suffer from any major mental illness or any personality disorders, and that his personality traits were fairly common and normal among the general population. In these circumstances, a reasonable fact finder could have found that Howe not only did not make a causal link between his injuries and the Palmers' conduct but also did not even know that he had been injured. In other words, the jury could have determined that, because of his relatively normal personality profile, Howe's failure to appreciate his injury or the causal link to the Palmers was objectively reasonable.[7,8]

This is precisely what distinguishes this case from others

---

[7] The jury were presented with a special verdict question asking: "Did Mr. Howe know, or should he have known, prior to March 1, 2003, that his ownership interest in his real estate had been harmed by the actions of Mr.

where we have declined the invitation to toll the running of the statute based on a claim of undue influence. See, e.g., *Babco Indus.* v. *New England Merch. Natl. Bank*, 6 Mass. App. Ct. 929, 930 (1978). Howe did not wait on his legal rights because of personality traits such as a desire to avoid confrontation. Here, Howe was unaware that he had been injured because he had been influenced to believe that execution of the deed was the correct, moral action to take.

*Intentional infliction of emotional distress.* Finally, the evidence warranted a jury verdict on Howe's claim that Palmer had intentionally inflicted emotional distress. Howe was subjected to a concerted, comprehensive, and relentless campaign to overpower his will by the infliction of emotional distress. The Palmers gradually and incrementally exploited each of Howe's personal concerns and weaknesses. They isolated him from his few family members. They alienated him from his church, convincing him of his pastor's spiritual unworthiness while enlisting the aid of another member of the clergy who was apparently complicit, if not in league, with the Palmers. They separated him from the counsel and trust of his wife, eventually convincing him to move away from his farm and his wife and live in a trailer on a neighbor's farm. The Palmers became ordained ministers (through a correspondence course), created a Christian ministry on the farm, convinced Howe that he exhibited the characteristics of "Satan," and counselled him, through clergy acting on their behalf, that he must do whatever the Palmers required him to do. The Palmers had convinced Howe that he had to convey an interest in his farm to them as joint tenants by the entirety as payment for the cash value of services they rendered in cleaning up the farmhouse and the

---

and Mrs. Palmer?" The jury answered unanimously that Howe did not know nor should he have known that he had been harmed before that date.

[8]The Palmers have failed to provide us with a transcript of the jury charge, nor does the record reflect that they made a proper objection to the special verdict question or to any relevant jury instruction. "A party must make a proper objection to a jury instruction before the jury retires in order to preserve the issue for appeal," *Jarry* v. *Corsaro*, 40 Mass. App. Ct. 601, 603 (1996), citing *Abraham* v. *Woburn*, 383 Mass. 724, 732 (1981), and the "party who fails to comply with [this] rule . . . forfeits his right to complain on appeal of the giving or omission of an instruction," *ibid.*, quoting from *Narkin* v. *Springfield*, 5 Mass. App. Ct. 489, 491 (1977).

surrounding property. This pattern of psychological abuse and control, and the resulting fear and intimidation created in Howe, continued relentlessly from 1999 until 2005, when he moved off the farm. A short time later, and despite the Palmers' efforts to prevent a reconciliation, Esther left the farm and joined her husband. Now, out of the control and abuse by the Palmers, and reconciled with his wife, Howe began this action.

These actions were not simple insults or mere displays of anger or overzealousness. Howe suffered several years of torment caused by the intentional, or reckless, conduct of Palmer. The jury were warranted in finding that Palmer's conduct was extreme, outrageous, and beyond the bounds of decency in a civilized community, and that the distress experienced by Howe was severe. See *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 142-145 (1976). The facts of this case amply supported a jury finding that Palmer's conduct exemplified an "abuse of ordinary decencies," entitling them to "put as harsh a face on the actions of [Palmer] as the basic facts would reasonably allow." *Richey* v. *American Auto. Assn.*, 380 Mass. 835, 839 (1980).

*Amended final judgment*
*affirmed.*